[Crim. No. 12854. In Bank. Mar. 20, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
LEO ESTRADA ROBLES, Defendant and Appellant.

**COUNSEL**

Robert N. Beechinor, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PETERS, J.**— Leo Estrada Robles was convicted after a jury trial of assault with a deadly weapon by a life prisoner (Pen. Code, § 4500), and first degree murder (Pen. Code, § 187). The jury in a separate trial fixed the penalty for both crimes at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On November 6, 1967, Forrest Willard Smith, a San Quentin inmate, was murdered; he had been struck on the head and ear, and his throat was cut from ear to ear. Defendant Robles was charged by indictment with assault with a deadly weapon while serving a life term, and first degree murder. (Pen. Code, §§ 4500, 187.) Two prior convictions were alleged, assault with intent to commit murder, and murder.

Robles pleaded not guilty and not guilty by reason of insanity, and admitted the prior convictions. The court appointed three psychiatrists to determine whether Robles was sane when he committed the charged offenses and whether he was presently sane. After the psychiatrists filed reports that Robles was at both times sane, the court declared a doubt as to Robles' sanity (Pen. Code, § 1368), and the question of Robles' sanity was tried to a jury, which found that Robles was able to understand the nature of the charges against him and to cooperate with his attorney in his defense.

The court appointed counsel in place of the public defender. After a trial by jury, on July 25, 1968, Robles was found guilty as charged on both counts. The court granted Robles' motion to withdraw his plea of not guilty by reason of insanity, and to discharge his attorneys and proceed in propria persona during the penalty phase. The court ordered that Robles' attorneys remain in court to serve as advisers. On August 8, 1968, the jury fixed the penalty for both offenses at death.

Defendant Robles on November 6, 1967, was housed in the psychiatric ward of the San Quentin prison hospital. About 9:30 that morning, Robles learned through the prison grapevine that he was going to be returned to the adjustment center. Robles was upset because he believed he had worked hard while in the psychiatric ward and hoped to be made a lead man, supervising other prisoner-attendants in the ward. That morning, another inmate, one Cruz, had a conversation with Robles, who stated that Robles was pretty upset and that he planned to put his hand through some windows. During another conversation in the afternoon, Robles took some pills; he then fell asleep, and Cruz and other inmates took Robles to his cell.

Robles arrived on a gurney at the San Quentin adjustment center about 3:40 that afternoon. Robles was conscious; he got off the gurney himself, staggered, then straightened up and walked by himself to the cells, where he conversed with various inmates for about 15 minutes. Robles asked one of his acquaintances to have a T-shirt ready, because he intended to break some windows; Robles later stated that he had in mind that if he acted violent and injured himself, he might be returned to the psychiatric ward.

Robles then ran his hand through a window, and a correctional officer took him to the hospital clinic for medical treatment. Robles was returned

to the psychiatric ward about 4 p.m. A prisoner-attendant observed that Robles had deep cuts on his right hand and that there was blood on his person. Robles appeared lucid in various conversations with the attendant; during the conversations, Robles stated: "I am going to kill some of those son-of-a-bitches over in A.C. [adjustment center]."

From 4 p.m., Robles roamed freely about the entire ward. He spoke to his acquaintances in the ward and tried to convince them to kill the attendants in the psychiatric ward, but the other inmates refused. Later in the evening, after 10 o'clock lockup, Robles was allowed to remain out of his cell to watch television. He was observed entering the cell of another inmate, Forrest Willard Smith. About 10:30, an inmate attendant looked into Smith's cell, saw a puddle of blood, ran out and hollered for another attendant. Robles was standing outside Smith's cell. He told the attendant that he "did it," and went into Smith's cell, emerging with "some objects" in a "white cloth."

A correctional officer, Perkins, arrived at the ward at about this time. Robles approached him and said, "I did something wrong; don't get pissed at me." Perkins asked him what he had done, and Robles pointed to Smith's room and said, "I killed him. I hit him over the head with something. I cut his throat, and I hope he is dead." Perkins looked into Smith's cell; Smith was lying on his back in bed; his throat had been cut from ear to ear, and his right ear was partially severed. Smith was still alive but died shortly thereafter.

A search of Smith's cell revealed a bloody toothbrush with a razor blade imbedded in it. Some weights wrapped in a T-shirt were found outside Smith's cell.

Robles was searched by two officers. He had to be forcibly restrained, shouted obscenities, and said, "I killed the son-of-a-bitch and I hope he dies." Robles' hands and clothes were bloody. He was taken by several correctional officers to the Adjustment Center. As Robles and the officers passed the clinic, where Smith's body was, Robles said several times "I hope you die, you son-of-a-bitch," and described Smith as a "No-good snitch mother-fucker, . . ."

The next day about 2:30 p.m., Robles, having been read his *Miranda* rights and having signed a card waiving those rights, confessed to a prison investigator, Sergeant Hankins. The substance of his confession was that he had been led to believe he would be made an attendant in the psychiatric ward, that he wanted to kill everyone in the psychiatric ward but the other inmates refused to cooperate, that he was going to kill several people, and killed Smith first because he did not like the way he looked, that he obtained two 10-pound weights and a heavy ashtray, which he wrapped

in a T-shirt, and that he entered Smith's cell, found Smith asleep, hit him over the head twice with the weights, took a razor blade, and cut Smith's throat, slashing six or seven times to get through to the jugular vein.

On November 15, Robles confessed to the Marin County District Attorney, after being warned of his *Miranda* rights. This confession differed from the confession to Sergeant Hankins in that Robles claimed he planned to kill Smith at 9 a.m. because he had given Smith two packs of cigarettes hoping that Smith would order drugs for Robles, but Smith refused to order any drugs. Robles stated he had inserted razor blades in three toothbrushes that morning and hid them. He claimed he had taken four seconal pills between 7 p.m. and 10 p.m., but that the medication was not affecting him at the time of the assault.

Robles also testified at his trial that he intended to and did kill Smith, and that he was aware of the consequences.

In addition to the testimony above, a pathologist, Dr. Hirabayashi, testified to the nature of Smith's wounds and the cause of his death, which he attributed to Smith's jugular vein being cut. He also testified that the wounds were consistent with the use of a razor blade and weights knotted in a T-shirt.

The sole defense was that Robles' capacity to premeditate and deliberate, and to bear malice aforethought, was diminished because of organic and physiological disturbances, in combination with the ingestion of drugs the day of the killing.

All the psychiatrists who testified agreed that Robles was not normal. The two prosecution psychiatrists, who examined Robles in March 1968, characterized Robles as a sociopathic or antisocial personality, but testified that Robles was conscious and aware that the killing was unlawful, that he could and did premeditate and deliberate the killing of Smith, and that if Robles had taken drugs, the drugs did not affect his mental capacity.

The defense psychiatrists were not in total agreement. Dr. Bewley, who as staff psychiatrist at San Quentin knew Robles intermittently from October 1966 to November 1967, characterized Robles as suffering from a schizophrenic reaction with marked paranoid elements. He testified that Robles' capacity was diminished, that Robles was not aware that it was against the law to kill, but that Robles had sufficient capacity to premeditate and deliberate the various events involved in the killing.

Dr. Wright, who observed Robles about 3:30 p.m. of the day of the killing, testified that Robles was then suffering from a drug reaction and characterized his condition as "paranoid psychosis." Although Dr. Wright testified on direct examination that Robles could not understand the law

in relation to his actions, on cross-examination, he testified that he had the capacity to know that the law prohibited taking another person's life.

Dr. Peterson, who examined Robles in March 1966, characterized Robles as suffering from acute schizophrenia of a paranoid type, but gave no testimony concerning Robles' mental capacity the day of the crime; on cross-examination, he testified that Robles' ability to premeditate was less than the average person.

Dr. Cary, who as staff psychiatrist at San Quentin saw Robles "off and on" for about a year before the crime, characterized Robles as suffering from schizophrenic reaction, paranoid type. He testified that on the day of the crime, Robles' ability to premeditate or deliberate was diminished, but on cross-examination he testified that Robles had the ability to premeditate and deliberate his act, and that Robles was aware that it was unlawful to take the life of another person.

Dr. Lamers, who examined Robles in May 1968, characterized him as a sociopathic personality antisocial type, and found disturbed electrical activity based on electroencephalogram tests. He testified that Robles on the day of the crime was not able to fully comprehend the quality of his actions, and that his capacity to premeditate or deliberate was diminished.

Dr. Drake, a neurologist, testified that he found some abnormality in an EEG tracing of Robles, but could not say, based on the EEG, whether Robles was aware that it was unlawful to take someone else's life.

In addition, about a dozen inmates and a visiting chaplain at San Quentin testified that Robles behaved in a peculiar fashion, and that he had engaged in incidents of self-mutilation.

The evidence was clearly sufficient to sustain both the judgments, and Robles does not argue to the contrary. Three defense and both prosecution psychiatrists testified that Robles could comprehend his duty to govern his actions in accordance with the law. Four defense and both prosecution psychiatrists testified that Robles could premeditate and deliberate his actions. The jury was, of course, not bound to reject this testimony and accept only that defense testimony favorable to Robles.

Robles contends that the prosecutor committed prejudicial misconduct by refusing, before the trial began, to accept a stipulation that Robles was undergoing a life sentence and by referring in his opening remarks to the jury to the fact that Robles was serving time for first degree murder, even though Robles had admitted in open court that he was serving a life sentence.

It is not challenged that an element of the crime of assault under section 4500 is that the defendant be a life prisoner, and that the prosecutor is required to prove that the defendant is a life prisoner. (See *People* v. *Chacon,* 69 Cal.2d 765, 777 [73 Cal.Rptr. 10, 447 P.2d 106]; *People* v. *Dorado,* 62 Cal.2d 338, 358 [43 Cal.Rptr. 169, 398 P.2d 361].) ▮ A prosecutor is not required to stipulate to the existence of any elements of the crime he is attempting to prove where the stipulaion will impair the effectiveness of the prosecutor's case and foreclose his options to obtain a conviction under differing theories. (See *People* v. *McClellan,* 71 Cal.2d 793, 800-803 [80 Cal.Rptr. 31, 457 P.2d 871]; *People* v. *Pollock,* 25 Cal. App.2d 440, 444 [77 P.2d 885].)

▮ Even assuming that under *People* v. *Chacon, supra,* 69 Cal.2d 765, 777-778, the prosecution may be required to accept a stipulation where the stipulated element involves legal status (i.e., life prisoner) rather than factual events (i.e., rape, as in *Pollock*), the conduct of the prosecutor in this case, if improper was not prejudicial.

In *Chacon,* the prosecutor introduced evidence through the prison records officer that "each of the four defendants was serving a life term at the time of the incident and listed all the convictions for which each was serving time, a total of nine violent or dangerous felonies for all of them." (69 Cal.2d at p. 777.) Most of the felonies were not punishable by life imprisonment. (*Id.,* fn. 4.) In those circumstances, the court ruled that "the prejudicial effect of this cumulative testimony outweighed the legitimate purposes served by its admission." (69 Cal.2d at p. 777.) The case was reversed on other grounds, however, and the court merely noted that the "prosecution could have established the fact that the defendants are life termers in a less prejudicial way than that undertaken here." (69 Cal.2d at p. 778.)

In this case, the prosecutor stated in his opening remarks that Robles' attorney had admitted "that the evidence the People will produce will show that . . . the defendant in this case, was serving a life term at San Quentin State Prison for the offense of premeditated and deliberate murder, or murder in the first degree." Defense counsel promptly interrupted and demanded a mistrial; the court immediately instructed the jury, first, that nothing said by counsel or by the court was to be considered as evidence, and second, that the "only purpose of any evidence" that might be produced concerning Robles' imprisonment was to show that he was undergoing a life term. No further reference was made by the prosecutor to Robles' convictions, and the prosecutor subsequently agreed to the stipulation.

The evidence against Robles included two extrajudicial confessions and numerous admissions. The fact that he was serving a life term itself indicated that he had committed a serious crime, and the jury was entitled to know he was serving a life term. The prosecutor did not dwell on the details of the crime. Robles chose to testify in his own defense and on cross-examination was impeached by his prior felony convictions, and admitted that he had been previously convicted of assault with intent to commit murder and murder of the first degree. Assuming the prosecutor's remarks were improper, Robles could not have been prejudiced by the remarks. (See *People* v. *Watson,* 46 Cal.2d 818, 837-838 [299 P.2d 243].)

■ Four black-and-white photographs showing the victim's wounds were admitted into evidence over the objection of defense counsel. ■ It is well established that photographs of the crime are admissible if their probative value outweighs any inflammatory effect, and that the determination of probative value is ordinarily within the sound discretion of the trial court. (E.g., *People* v. *Nye,* 71 Cal.2d 356, 370 [78 Cal.Rptr. 467, 455 P.2d 395]; *People* v. *Bradford,* 70 Cal.2d 333, 341-342 [74 Cal.Rptr. 726, 450 P.2d 46].) ■ In the instant case, the photographs —which show in closeup and medium range both the head and throat wounds—aided the jury in understanding the pathologist's technical description of the wounds. (See *People* v. *Talbot,* 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633], overruled on other grounds in *People* v. *Ireland,* 70 Cal.2d 522, 540 [75 Cal.Rptr. 188, 450 P.2d 580].) Moreover, on cross-examination, defense counsel questioned the pathologist concerning the weapons used to inflict the injuries; the photographs doubtless aided the jury in deciding whether the wounds were in fact inflicted by a razor blade and weights as claimed by the prosecution.

■ Robles insisted on testifying in his own defense, over his attorneys' objections. Counsel on appeal now contends that the trial court erred in allowing Robles to testify. The contention is without merit. ■ Although, as counsel properly notes, an attorney representing a criminal defendant has the power to control the court proceedings (e.g., *People* v. *Foster,* 67 Cal.2d 604, 606 [63 Cal.Rptr. 288, 432 P.2d 976]; *People* v. *Hill,* 67 Cal. 2d 105, 114-115 [60 Cal.Rptr. 234, 429 P.2d 586]; *People* v. *Darling,* 58 Cal.2d 15, 19 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Mattson,* 51 Cal.2d 777, 789 [336 P.2d 937]; *People* v. *Merkouris,* 46 Cal.2d 540, 554-555 [297 P.2d 999]), that power may not be exercised to deprive a defendant of certain fundamental rights (cf. *In re Tahl,* 1 Cal.3d 122, 131-133 [81 Cal.Rptr. 577, 460 P.2d 449]; *People* v. *Holmes,* 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583]).

We are satisfied that the right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. (*People* v. *Blye,* 233 Cal.App.2d 143, 149 [43 Cal.Rptr. 231].) The defendant's insistence upon testifying may in the final analysis be harmful to his case,[1] but the right is of such importance that every defendant should have it in a criminal case. Although normally the decision whether a defendant should testify is within the competence of the trial attorney (see *People* v. *Gutkowsky,* 219 Cal.App. 2d 223, 227 [33 Cal.Rptr. 79]), where, as here, a defendant insists that he wants to testify, he cannot be deprived of that opportunity.

The fact that an indigent defendant and his appointed counsel disagree as to whether the former should testify does not necessarily mean that the attorney should be discharged although it is a factor to be considered in connection with a motion for substitution. Requiring an attorney against his better judgment to examine his client places no unfair burden on the attorney; an attorney is always faced with the burden of developing his trial strategy in the light of what evidence is available and presented in court. Nor is a defendant ordinarily prejudiced when he is represented by an attorney who believes, contrary to the defendant, that the latter should not testify. On the other hand, in a few cases the disagreement as to whether a defendant should testify may signal a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel.

 In the instant case, defendant was permitted to testify, one of his attorneys ably participated in the examination, and his attorneys ably represented him during the guilt trial notwithstanding the disagreement.

 Robles next contends that since the trial court determined during the guilt trial that he was incompetent to represent himself it erred in permitting him to waive counsel during the penalty trial and to represent himself. As noted above, prior to the guilt trial there was a sanity hearing pursuant to section 1368 of the Penal Code which resulted in a jury finding that Robles was presently sane and able to cooperate with his attorneys in his defense. During the guilt trial Robles sought to discharge his attorneys and represent himself. The trial court determined that Robles could not knowingly and intelligently waive his right to counsel. Robles' conduct during the earlier portion of the trial, and the court's

---

[1]In some situations, a defendant's persistence in testifying contrary to his attorney's advice might raise questions as to the defendant's present sanity. In this case, there was a pretrial sanity hearing conducted pursuant to Penal Code, section 1368, which resulted in a jury finding Robles presently sane.

extensive inquiry into Robles' competence make clear that his incompetence was not limited to technical inadequacies less likely to be significant at the penalty trial.

During the guilt trial Robles' sole defense was diminished capacity; however, contrary to the testimony of all the psychiatrists, including those for the prosecution (who conceded that Robles was not normal), Robles believed himself to be perfectly normal. When defense psychiatrists testified to his mental difficulties, Robles interrupted, and talked to his counsel in a loud voice.

Other than psychiatrists, the only witnesses who could testify to Robles' strange conduct were his fellow inmates. Robles made no attempt to control their deportment; rather, he encouraged the witnesses to act in a rude and offensive fashion; in one instance, he signalled one of the witnesses to provide an answer, in full view of the jury. That witness subsequently answered that he had not noticed anything unusual about Robles' behavior the day of the killing. Although the trial court repeatedly advised him to restrain himself, Robles persisted in reflecting overt disapproval of and disinterest in the proceedings.

After the defense attorneys stated that they were prepared to rest but prior to permitting Robles to testify, the trial judge questioned him extensively as to his education and his understanding of the charges against him. Robles stated that he had not completed high school, that four of the five years since leaving high school had been spent in institutions, and that he had difficulty with the English language both in his pronunciation and as to making himself understood. Robles' responses to questions relating to the offenses charged and possible defenses revealed that, although he had a rough understanding of the elements of the offenses, he did not fully understand the defense of diminished capacity. The trial judge then concluded that Robles could not "intelligently and comprehendingly waive his right . . . to counsel."

Robles was thereafter permitted to tell his story to the jury from the witness stand. He attempted to do this in the form of a narrative rather than in response to specific questions. His testimony was rambling and to a large extent incoherent. Much of the testimony had little to do with the charges for which he was on trial. Subsequently one of the defense attorneys questioned him about the offense, and his answers in large part were coherent and related to the offenses charged. Robles testified under his defense counsel's questioning that beginning at age 11 he had been sent six or seven times to Agnew State Hospital and once to Napa State Hospital

and that on the day of the killing he had a tumbler of "home brew" and three grains of seconal. Robles maintained, however, that he was not mentally ill and that his primary reason for testifying was to prove to the jury that he was not mentally ill. Although most of his answers to his attorney's questions were clear and direct, on a few occasions he launched into rambling explanations which were difficult to understand.

After his testimony, believing he had not sufficiently disagreed with the psychiatrists, he attempted to submit a statement to the court, his attorneys, and the district attorney, clarifying his testimony, which the court excluded as cumulative.

Despite admonishments from the court that Robles was hurting his defense (by shuffling papers, snapping his fingers, breaking pencils, and making comments), Robles' deportment continued to be offensive during the prosecution's rebuttal. He told the court that, "as far as what the jury thinks, I don't give a damn. The jurors are just a bunch of fools sitting up there and I don't care what the jury thinks."

By the time the jury returned its verdict in the guilt phase, Robles' hostility was uncontrollable. He called the jurors, "Son-of-a-bitches," the judge, an "old man," and one of his attorneys, a "fucking punk." At least some of these remarks were heard by the jury. He made clear that he wanted to discharge his attorneys and that he wanted to represent himself at the penalty phase.

After the jury returned a verdict of guilty, Robles withdrew his plea of not guilty by reason of insanity. His attorneys concurred in the withdrawal of the plea.

Robles then moved to discharge his attorneys and to proceed as his own attorney. He stated that he was unable to get along with his attorneys. The judge explained that during the penalty trial evidence could be presented to mitigate the penalty or aggravate it. He pointed out that evidence could be presented as to the defendant's background, history, and mental and physical condition. He asked the defendant whether he understood this, and received an affirmative reply. Aside from this one question, the trial judge did not ask Robles any questions as to the issues involved in the penalty trial or the evidence that might be presented.

One of Robles' attorneys stated that he did not think that Robles understood the "significance" of proceeding without representation by trained men, and the prosecutor stated that he did not think that Robles was capable of representing himself.

The trial judge did not determine that Robles could intelligently and understandably waive counsel and represent himself. He determined:

"Probably with counsel to advise him he could conceivably represent himself in the next phase of the case." Upon their agreement to act as advisors to Robles, the trial judge discharged the defense attorneys as counsel of record and permitted Robles to represent himself.

■ A "defendant in a criminal case has the constitutional right to waive counsel and represent himself if he knowingly and intelligently elects to do so. [Citations.]" (E.g., *People* v. *Maddox*, 67 Cal.2d 647, 651 [63 Cal. Rptr. 371, 433 P.2d 163].) ■ He may waive counsel only if he has an intelligent conception of the consequences of his act (*People* v. *Carter*, 66 Cal.2d 666, 670 [58 Cal.Rptr. 614, 427 P.2d 214]) and understands the nature of the offense, the available pleas and defenses, and the possible punishments (*In re Johnson*, 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420]). ■ The determination of the trial judge as to the defendant's competence to waive counsel involves an exercise of discretion by the trial judge which in the absence of an abuse of discretion will not be disturbed on appeal. (*People* v. *Carter, supra,* 66 Cal.2d 666, 672.)

The scope of the inquiry into a defendant's ability to defend himself "will, of course, vary according to the seriousness of the crime charged," and "in reviewing a trial judge's determination of a defendant's comppetence to represent himself, we will not accept a mere superficial inquiry." (*People* v. *Carter, supra,* 66 Cal.2d 666, 672-673.)

■ On the record before us there is no basis for a conclusion that Robles was competent to waive counsel and represent himself. Before trial, there had been a doubt as to competency even to stand trial. Although after a trial on the issue of his competency it was determined that he could stand trial for the criminal offenses, the trial court determined, toward the end of the guilt trial, that Robles was not competent to defend himself. This determination of the trial court was overwhelmingly supported by evidence of Robles' limited education, his speech difficulties, his limited understanding of his defense, and his offensive conduct during the trial.

Robles' conduct during the guilt trial, subsequent to the trial court's determination that he was incompetent to represent himself, was even more disorganized and hostile than his earlier conduct and culminated with his outburst against the jurors, the judge, and one of his attorneys. Such conduct can only be viewed as lending further support to the trial judge's determination that he was incompetent to defend himself. Although Robles spoke coherently in connection with the motion to represent himself at the penalty trial, the judge made only a superficial inquiry as to Robles' understanding of the issues in the penalty trial and of the evidence that might be introduced therein. In the light of his prior conduct, his limited education, his difficulties with the English language, and the trial court's prior deter-

mination that he was incompetent to defend himself, we must conclude that there was no sufficient showing that Robles was competent to defend himself or that he could knowingly and intelligently waive counsel.

It bears emphasis in this regard that the trial court did not find that Robles was competent to defend himself in the penalty trial. He went no further than to state that Robles might be competent if he had counsel to advise him. Proceeding with advisory counsel, Robles was permitted to take charge of the defense at a time when there was no sufficient showing that he understood the issues in the penalty trial. The error in permitting him to do so requires reversal as to penalty.

This conclusion makes it unnecessary to pass on the question whether jurors were excused in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

Robles next argues that the exclusion at the *guilt* trial of jurors properly excludable under *Witherspoon* results in an unrepresentative jury of persons more likely to convict a defendant and he requests an evidentiary hearing to develop his contentions.

We have previously rejected similar requests for evidentiary hearings. (*In re Eli,* 71 Cal.2d 214, 218 [77 Cal.Rptr. 665, 454 P.2d 337]; *In re Arguello,* 71 Cal.2d 13, 16 [76 Cal.Rptr. 633, 452 P.2d 921]; *In re Anderson,* 69 Cal.2d 613, 621 [73 Cal.Rptr. 21, 447 P.2d 117].) Robles, like the defendants in *Arguello* and *Eli,* does "not state whether or not he was now prepared for such a hearing" and does not give any "indication of the nature of the evidence" he intends to introduce. (*In re Eli, supra,* 71 Cal.2d at p. 218.) An evidentiary hearing is, therefore, not warranted.

The request for an evidentiary hearing is denied. The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Tobriner, Acting C. J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I concur in the opinion to the extent it affirms defendant's conviction. However, I strongly dissent from the reversal of the penalty trial.

The majority reverse the penalty trial on the ground that defendant was incompetent to represent himself during the penalty phase. This contention

should have been summarily disposed of by application of the well-established rule that the trial judge has wide discretion in determining the competence of defendant to waive counsel and that his determination cannot be set aside in the absence of an abuse of discretion. (*People* v. *Daniels,* 71 Cal.2d 1119, 1142 [80 Cal.Rptr. 897, 459 P.2d 225]; *People* v. *Carter,* 66 Cal.2d 666, 672 [58 Cal.Rptr. 614, 427 P.2d 214]; *People* v. *Ashley,* 59 Cal.2d 339, 361 [29 Cal.Rptr. 16, 379 P.2d 496].)

Under the application of this rule the determination of defendant's competence to waive counsel is properly left to the discretion of the trial judge, who is in the best position to adjudge that matter. This determination "involves a consideration of the nature of the charge, the facts and circumstances of the case, and the education, experience, mental competence and conduct of the accused. [Citations.]" (*People* v. *Stanworth,* 71 Cal.2d 820, 834 [80 Cal.Rptr. 49, 457 P.2d 889], quoting from an earlier case.)

Although the majority acknowledge the existence of this basic rule, *ante,* page 218 of the opinion, they proceed to decide the issue de novo, stating that "On the record before us there is no basis for a conclusion that Robles was competent to waive counsel and represent himself."

The reference to a few significant facts from the trial record will suffice to indicate ample support for the trial judge's determination and that the majority here are simply substituting their own weighing of the facts for that of the trial judge; that this is impermissible is clear from the authorities cited above.

Prior to ruling on the matter, the trial judge and jury had heard extensive testimony from eight experts regarding defendant's mental capacity and background. At the conclusion of a four-day sanity trial, the jury concluded that defendant "now has the ability to understand the nature of the charges against him and to cooperate with his attorney in a rational manner in the conduct of his defense."

The trial judge had also heard 21 days of testimony during the guilt phase, including defendant's own testimony on the witness stand and frequent colloquy in chambers. Thus, the trial judge had a most unusual, in fact an excellent, opportunity to adjudge and determine defendant's competence. The majority attach great significance to the trial judge's refusal to permit defendant to represent himself at the *guilt* trial. However, this was largely because of defendant's evident unfamiliarity with the legal defenses which might be available to him. The majority seem to suggest

that this determination somehow estopped the trial judge from reaching a different conclusion at the penalty trial. However, it is evident to me that the trial judge should have discretion to determine that although a particular defendant may be incompetent to represent himself during a guilt trial, he may be entirely competent to do so during the penalty phase wherein knowledge of legal principles plays a less important role and the entire purpose is to afford the jury with a more comprehensive picture of the individual who is the subject of the inquiry concerning penalty.

The defendant had completed 11th grade in high school, and his testimony was ordinarily coherent, though occasionally vague and crude. After guilt verdicts were rendered against him, he pleaded with the judge to permit him to represent himself so that he might present to the jury "a new approach towards my behavior" which might prove more effective than the tactics planned by defendant's trial counsel. The judge carefully examined defendant on the question and explained to him the significance of his request, the general nature of a penalty trial, the broadened evidentiary scope of the proceedings, the possibility of a death sentence, and the availability of an automatic appeal. The record indicates that defendant understood and fully appreciated the nature of the proceedings and the risks involved.

The trial judge went farther than was legally necessary to protect defendant and to insure that he received a fair trial. In permitting defendant to represent himself the judge attached the condition that he accept the advice and counsel of his *two* trial attorneys, who were thereupon appointed to serve as defendant's "advisors" during the penalty trial. Defendant accepted this condition and frequently consulted with his advisers during the ensuing trial regarding the examination of witnesses, the introduction of evidence, and the making of objections. On several occasions, these advisers actually argued legal points for defendant. Although, personally, I do not favor dividing responsibility in this manner and if I were counsel so appointed I would hesitate to accept the assignment, nevertheless the system does add substantial protection to a defendant while permitting him to exercise his constitutional right (Cal. Const., art. I, § 13) to conduct his own defense.

Indeed the record discloses that defendant competently represented himself during the penalty trial, making opening and closing arguments to the jury, calling and examining 16 witnesses, cross-examining prosecution witnesses, and making objections during the course of the trial.

In *People* v. *Ashley, supra*, 59 Cal.2d 339, 361, defendant was charged with the murder of a six-year-old girl. Although he had been found to be insane when he first appeared in court, he was subsequently found to have

regained his sanity. Accordingly, he was arraigned and tried for murder. Defendant insisted on representing himself during the entire trial which consisted of guilt, sanity and penalty phases. He requested, but was denied, counsel to advise him during the trial. Acting as his own counsel, defendant made few objections, cross-examined few witnesses, acted as his own sole witness, and made incomprehensible arguments to the jury. Nevertheless, on appeal, this court rejected defendant's contentions that he was entitled to the aid of an attorney-adviser, and that he was incompetent to act as his own attorney, stating that "Counsel suggests that because of defendant's mental condition he may have been mentally in a condition to assist counsel in his defense, but was in no mental condition to defend himself. . . . *These were matters for the trial court to weigh.* If at any time before or during the trial the judge entertained a doubt of defendant's sanity it was his duty to stop proceedings and try the issue of present sanity. (Pen. Code, § 1368.) *He was in the best position to weigh such matters* [citation]. . . . [B]efore the trial court allowed defendant to represent himself, the trial court sought the advice of three pychiatrists, was assured by them that defendant was presently sane within the meaning of the section, and had several discussions with defendant about the problem. *The record sustains the conclusion that defendant was aware of his situation when he insisted on representing himself. These factors are controlling. (People v. Linden . . . 52 Cal.2d 1,* 18 [338 P.2d 397].)" (Italics added.)

Since the trial court did not abuse its discretion in *People v. Ashley, supra,* wherein defendant had neither a section 1368 sanity hearing nor the aid of attorney-advisers, certainly no abuse occurred in the instant case where he was afforded both safeguards. I would affirm the judgment in its entirety.

McComb, J., concurred.