287 So.2d 889

**Archie TAYLOR**

v.

**STATE.**

**6 Div. 422.**

Court of Criminal Appeals of Alabama.

April 3, 1973.

Rehearing Denied May 29, 1973.

Calvin M. Howard, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree in the Circuit Court of Jefferson County and sentenced to life imprisonment. Prior to arraignment is was

ascertained that appellant was indigent and counsel was appointed to represent him.

This is a bizarre case. There were four eye witnesses to the killing. Appellant knew the witnesses and they knew him yet he denied he was at the scene. A police officer saw him running from the scene and chased him about four blocks but another officer "headed him off", and he was taken into custody. He first told his court appointed lawyer that he was in a cafe about two blocks away having an egg sandwich and a cup of coffee when the homicide occurred and when he left the cafe he saw an ambulance and a crowd of people gathered around. He got curious as to what was happening and decided to investigate. When he reached the scene he was placed under arrest and was not told why. His lawyer made a thorough investigation as to the facts in the case as well as appellant's alibi. No one in the cafe saw him on the morning of the homicide. He stuck to this story until two minutes before the trial started at which time he turned to his lawyer and said, "Now I know where I was when the killing took place. I was in jail." He produced a receipt from the warden at the county jail and claimed the date thereon was August 1, 1971, and the shooting occurred on August 6. This alibi was shot down when the jailer testified that what appeared to be August 1, was actually August 7, 1971. Appellant's alibi "cracked up" and the jury "cracked down" on him. The verdict was rendered on Feb-

ruary 2, 1972, and on February 7, 1972, the trial judge received a letter from appellant requesting that he be given a new trial because his lawyer failed to produce some very important evidence during the trial that was available and well known to the attorney. The letter [1] was treated by the trial judge as a motion for a new trial. A day was set to hear the motion and another lawyer was appointed to represent appellant at the hearing and now represents him on this appeal.

At the hearing on the motion for a new trial, the following facts were developed:

The police officer who was in "hot pursuit" of appellant immediately after the killing stopped by the body of the deceased and picked up a pocket knife with the blade two-thirds open. He put the knife in his pocket to preserve evidence. This officer returned to the scene and found the deputy coroner of the county examining the body. He told the coroner about the knife. During a recess at the main trial the coroner told the judge about the knife. The trial judge called the prosecuting attorney and the defense attorney to his chambers for a discussion of this matter. Both knew about the open knife in or near the hand of the deceased at the place of the killing. The prosecution knew about the knife as this evidence was presented to the grand jury and the defense attorney was permitted to read the grand jury notes. In addition to this information the defense attorney in making his prepara-

[1]

"708 21st No
Bham Ala

"Hon. Judge Gibson
"Dear Sir,
"I, Archie Taylor was convicted of 1° degree muder (sic) on the second of Feb. I am writing to ask you to reconsider my case for and (sic) appeal on the grounds of misrepresentation by my lawyer.
"He fail to product (sic) evidence in my faver (sic).
"It was stated by a wittness (sic) that the said James Mason had a knife open at the seen (sic) of the crime. It was found open by a detective. Also the coroner reports stated that James Mason was drunk at the time. My lawyer fail to say anything about

it at the trial. The knife and the detective was not producted (sic) at the trial.
"Your Hon.
"My knowledge of law is very little, so I am asking you to please appointed (sic) me someone to help me in this matter because I thank (sic) that the court should know all about the case.
"I am 58 years of age and I don't have any money and know (sic) one here to call upon for help.
"Closing with all respect to you:
"Sincerly (sic) Yours
"Archie Taylor
"Filed in open Court this the 7th day of February, 1972, and passed to March 24, 1972 at 1:30 P.M.
"Wallace Gibson, Judge"

tions for trial went to the coroner's office and made inquiry as to whether a blood sample was taken from the body of the deceased to determine if he had been drinking. He learned that a blood sample had been taken and the State Toxicologist had made his report. This report is as follows:

"(ALABAMA GREAT SEAL)

"C. J. Rehling, Ph.D., Auburn
State Toxicologist
B. H. Orndorff, Auburn
Toxicologist

Toxicologists
Nelson E. Grubbs, Mobile
Robert B. Johnson, Birmingham
Vann V. Pruitt, Jr., Huntsville
Carlos L. Rabren, Auburn
James L. Small, Montgomery

"STATE OF ALABAMA
DEPARTMENT OF TOXICOLOGY
and
CRIMINAL INVESTIGATION
Auburn, Alabama
BIRMINGHAM DIVISION
507 Public Health Building
Birmingham, Alabama

August 16, 1971

"Coroner Harry Freeman
Court House
Birmingham, Alabama

RE: Case 115–82101
Jimmy Lee Mason, dec., victim
Archie Taylor, Susp.

"Dear Sir:

"The specimen of blood received by this laboratory on August 9, 1971 has been subjected to microanalyses as requested.

"Microchemical analyses of this specimen have identified 0.23 per cent ethyl alcohol therein.

"A person with the above per cent of alcohol in his blood would be considered under the influence of intoxicating beverages and incapable of safely operating a motor vehicle or conducting other tasks requiring a similar degree of skill and coordination.

"This specimen will be retained in this laboratory for seven days and will be destroyed after that time unless further instructions are received from you.

"Yours very truly,
C. J. Rehling, Ph.D.
State Toxicologist

/s/ Robert B. Johnson

By: Robert B. Johnson
Toxicologist"

Armed with these two most valuable pieces of evidence, the defense attorney again consulted appellant and told him he (the attorney) could make a good case of self-defense. Appellant replied, "maybe we could, but I wasn't there." The defense attorney said, "Well, I cannot make out a case of self-defense if you weren't there." Appellant said "nonetheless, that is what I am going to say. I wasn't there."

All of the above and more was related to the trial judge during the recess. The defense attorney told the judge that he pleaded with appellant to let him put this evidence on and appellant steadfastly refused to do so and vehemently denied that he shot and killed the deceased.

Appellant testified on the motion for a new trial and on cross-examination the prosecution asked him if it was not true that during the course of the trial, in the courtroom in the presence of the defense attorney and the prosecutor, right before any testimony was taken, that the defense attorney told him that his best defense was self-defense, and appellant denied that this occurred, saying "He haven't mentioned self-defense to me during the whole time he walked (sic) up to me." Just after the jury was struck the defense attorney said to appellant, "This is the last chance we have to plead self-defense. Let's go with self-defense." Appellant again refused.

Faced with a recalcitrant and uncooperative defendant who was adamant in "quarterbacking" his own trial, the defense attorney negotiated with the prosecution and obtained an agreement with the State that it would accept a term of twenty (20) years in the penitentiary. This was submitted to appellant and it was rejected by him.

In chambers, after being made aware of the open knife and appellant's staunch refusal to cooperate and allow his lawyer to conduct the defense in the way he thought proper, the trial judge told the defense attorney to "make voluminous notes, so that if he needed to remember almost immediately, or years later, that he would have enough notes to refresh his recollection about this, because, in my opinion, the petitioner (defendant), through interference in this case, or because the case was the case it was, or whatever it was, after a long period of time in the penitentiary, then he would come back and say that someone had improperly represented him."

At the hearing on the motion for a new trial, the court said, "Now, the court wants to go ahead and take testimony on this matter for more reasons than one, one being that I see no reason of going up on appeal and having a silent record on this and then coming back on a coram nobis, which is the normal way a contention such as this is handled."

Appellant did not wait on the efflux of time when memories tend to fade and recollections grow dim. He wrote the letter five (5) days after his conviction. At the conclusion of the hearing, the trial court overruled the motion for a new trial.

During the months intervening from indictment, arraignment and trial, the defense attorney conferred with appellant on numerous occasions as to witnesses who might be able to give favorable testimony in behalf of appellant, including character evidence. Appellant gave him the names of some white ladies in Mountain Brook and Vestavia for whom he did yard work. One woman contacted by the attorney said she only knew him as a yard man and did not know anything about his character and reputation. His attorney then checked appellant's FBI report or "rap sheet" and found that appellant had been convicted and served time for many crimes of violence throughout the country. In the light of his past record, the attorney abandoned his search for character witnesses and rightly so.

The sole and only claim of error on this appeal is the action of the trial court in overruling and denying the motion for a new trial.

We believe that all legal minds, familiar with the facts as developed on the motion for a new trial can be of but one persuasion and that is that the evidence relating to the open knife and the intoxicated condition of the deceased should be submitted to a jury. It is most probable that a different verdict will be rendered.

■ A lawyer must never subordinate his professional knowledge, skills, trial strategy or tactics to the whims of a client whether he be of feeble intellect, completely illiterate, a member of the intelligentsia, of low birth or born in the upper strata of society. To hold otherwise will cause the adversary system to collapse and, in most cases, be an effective denial of the guarantee of the right to counsel contained in the Sixth Amendment and so eloquently expressed in Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158, wherein it is stated:

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."

■ Faced with the dilemma that confronted him, and knowing full well that the alibi evidence was like a sieve, and that appellant's only possible defense was self-defense, he should have done one of two things. He should have gone to the trial court and made a full disclosure and asked to be relieved from the case, or he should have ignored the dictates of appellant and introduced the knife in evidence and the findings of the Toxicologist's showing the advanced stage of intoxication of the deceased. *It is trial counsel's decision on the matters here involved that must control.*

"Counsel is the manager of the lawsuit; this is of the essence of the adversary system of which we are so proud. In the nature of things he must be, because he knows how to do the job and the defendant does not. That is why counsel must be there." Rhay v. Browder, 9th Cir., 342 F.2d 345.

The right of counsel to control litigation was recognized in this state over a century ago. Rosenbaum v. State, 33 Ala. 354. In this case, Mr. Justice Stone said, "To hold otherwise, would greatly embarrass judicial proceedings."

■ Courts throughout the country, notably California and the Federal courts, have consistently recognized that the right and duty to control the trial is squarely placed upon the shoulders of counsel.

In People v. Ferry, 237 Cal.App.2d 880, 47 Cal.Rptr. 324, the District Court of Appeals, Third District, said:

"It is worthy of note that this was not defendant's first 'brush' with the law. He had suffered four prior convictions, was on parole, and it is to be supposed

that he had some knowledge of court proceedings in criminal matters. About six months had elapsed, during which time he discussed his case with various attorneys, including the public defender, and these discussions must surely have involved some talk as to conduct of the defense and as to witnesses who might be summoned in his defense. His claim that he and his counsel were not in full accord as to the conduct of the case is not unusual. It happens frequently. But responsibility for deciding how a case shall be conducted is placed squarely upon the shoulders of counsel and properly so. It is his right and duty to control the trial. (People v. Mattson, 51 Cal.2d 777, 788, 336 P.2d 937.) * * *"

See Wilson v. Gray, 345 F.2d 282; Poole v. Fitzharris, 396 F.2d 544; People v. Robles, 2 Cal.3d 205, 466 P.2d 710, 85 Cal.Rptr. 166.

■ We do not want to be understood as holding that had defense counsel introduced the knife in evidence and the alcoholic content in the body of the deceased, all over the objections and protests of appellant, that appellant would have been robbed of his right to take the witness stand and testify as to his alleged alibi. This was and is his constitutional right. Appellant's FBI record would have been a "red flag" to any defense attorney but an accused can never be denied his constitutional right to give evidence in his behalf. Henry v. Mississippi, 379 U.S. 443, 85 S. Ct. 564, 13 L.Ed.2d 408; Whitus v. Balkcom, 333 F.2d 496; People v. Robles, supra.

On the record before us we are not confronted with the many, many grounds and reasons for granting or denying new trials in criminal prosecutions. This is not a case of newly discovered evidence, for as we have pointed out, the question of the knife and the alcohol content in the body of the deceased was known to the trial judge, the prosecutor and defense attorney

before the trial in chief was concluded. We hold that these two items of evidence are potent, material, competent, relevant, and could well have been of incalculable benefit to appellant and it is highly probable that upon another trial a different result could well be obtained. Defense counsel, though conscientious and resourceful to the nth degree, allowed appellant to pursue a course that was inimical to his welfare, to his life, and to his liberty. Elementary principles of due process and fair play calls for a new trial.

The dissenting opinion proves the accuracy of our holding. He says that trial counsel was faced with two choices, his defense of self-defense, and appellant's—the alibi—and that obviously defense counsel "chose to go with alibi". The facts are the counsel did not choose to go with alibi. He was told by appellant what defense he must put up and when he went with alibi, he ipso facto surrendered to appellant's *control of the law suit*. Every official and participant in this courtroom drama, except the twelve most important, i. e. the jury, knew about the open knife in the hand of the deceased and that his cadaver was loaded with whiskey before the trial in chief was yet concluded. Everyone but the jury knew, too, that every breath uttered by appellant on the witness stand as to an alibi reeked with one falsehood after another.

The dissenting opinion says, "If indeed this appellant swore falsely, he must now bear the consequences." And what consequences? Life imprisonment grounded upon the rankest kind of plain stupidity dictated by an ignorant, disadvantaged black man received and acted upon by a lawyer familiar with the ways of a courtroom battle. If the dissenting opinion becomes the law of this case, then we are unwilling witnesses to trial advocacy impaled on a gibbett that strikes at the heart of fundamental fairness, witnesses to the demise of constitutional due process, and our adversary system being consigned to limbo.

The dissent further says that had the motion for a new trial been granted, another attorney would have had to be appointed and in all probability would have faced the same dilemma. This is a debatable question and is too speculative for further comment.

As always the dissenter speaks to the future, *and when he is right*, his voice is pitched to a key that will carry through the ages, but when he is wrong the printer's ink spirals to inflationary heights, and that is the only profit that emerges from this tangled maze of complexities.

Reversed and remanded for a new trial in conformity with this opinion. Appellant will remain in custody until discharged by law.

Reversed and remanded.

TYSON and DeCARLO, JJ., concur.

CATES, P. J., specially concurs.

ALMON, J., dissents.

CATES, Presiding Judge (concurring specially).

This case illustrates the twilight zone between the control of the client and the control of counsel. Basically, the control of the client extends only into the area of constitutional rights. Thus, in Singleton, 48 Ala.App. 157, 262 So.2d 772, we find a waiver of a trial by jury in a felony case.

The court below was very careful to address the defendant personally and to explain to him the implication of not having twelve men or women to pass upon the facts of the case. This colloquy was addressed to the defendant directly and the waiver came out of the defendant's own mouth.

But in the area of trial strategy counsel ordinarily has control of the case. See Henry v. Mississippi, 379 U.S. 452, 85 S. Ct. 564.

In *Henry* the twilight zone was described as circumstances which are exceptional relating to constitutional claims. In such cases the trial strategy, adopted by counsel without prior consultation with the accused, does not prevent a later assertion of those claims.

*Henry* was remanded to the Supreme Court of Mississippi for further proceedings. It is our understanding that the Mississippi court remanded the case back to its circuit court for an ultimate decision on the matter of the strategy employed—as to whether it was within the realm of constitutional protection or not.

The ABA Standards for Criminal Justice relating to the Prosecution Function and the Defense Function, contain the following:

"5.2 Control and direction of the case.

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are: (i) what plea to enter; (ii) whether to waive jury trial; (iii) whether to testify in his own behalf.

(b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client."

On balance, I believe, in this case that defense counsel should have gone ahead and brought out the self-defense theory even though it was inconsistent with the alibi defense.

Certain defenses, of course, take on the aspect of either/or. Thus, if a person pleads not guilty by reason of insanity he

in effect is pleading guilty, but insane. When he pleads alibi it is either he was there, or he was elsewhere. Certainly counsel could not invade the province of the defendant as to whether he should testify in his own behalf, but counsel should, of course, warn him of the deleterious consequences of claiming alibi in a case such as this.

Certainly self-defense is as completely exonerating if proved to the required degree as alibi and, in this case, a great deal less "fishy".

I would like to accord my agreement with the action of the trial judge in memorializing the record of the advice given by counsel to the accused. This in turn comports with Standard 5.2(c) of the ABA Standards, supra.

Finally, I look upon this, not as a case of inadequate counsel, but of counsel who was too solicitous of the goodwill of his client, even though this was an ill-deserved trust. The problem here is that the client's actions forced the hand of counsel into non action on a matter which should not belong to the client. Accordingly, I concur in Judge Harris' decision.

ALMON, Judge (dissenting).

I must respectfully dissent from the majority's resolution of this most difficult question.

I agree with the holding of the overwhelming majority of jurisdictions that the attorney, and not the client, has the exclusive right to determine and direct trial strategy. Decennial Digest, Attorney and Client, Key Nos. 88 and 92; 7 C.J.S. Attorney and Client, § 80B; 7 Am.Jur.2d, Attorneys at Law, § 120. It is my view that this attorney exercised that right and did in fact determine the trial strategy of this case.

His decision to defend on alibi, even though against his better judgment, was necessitated by the fact that the appellant vehemently denied that he was at the scene of the crime and that he shot and killed the deceased. His attorney told him that he could make a good case of self defense, to which appellant replied, "Maybe we could but I wasn't there." Faced with this, the attorney had to make a decision on whether to defend on alibi or self defense and obviously he decided to go with alibi. This decision was in the purview of trial strategy which the attorney himself made with knowledge of his client's version of the occurrence.[1] Certainly his client's version of the occurrence is probably the most important factor in determining trial strategy.

The defense of alibi and self defense are totally inconsistent. Self defense is in the nature of confession and avoidance whereas alibi denies the killing under a claim that the defendant was not at the scene. To introduce evidence tending to establish both self defense and alibi would necessarily weaken appellant's case. It would be very unusual for trial counsel to be defending on self defense and the defendant, on alibi. Such would amount in all probability to no defense at all. This attorney did everything a diligent attorney should have done, save possibly making a motion to the court that he be relieved of his responsibility under the law to defend this appellant. Had such a motion been granted, another attorney would have had to be appointed and in all probability would have faced the same dilemma.

Let us assume for the purpose of argument that the attorney in this case had

---

[1]. The trial attorney testified on motion for a new trial as follows:

"Q. Did he ever tell you, 'Do not use self defense in my case'"

"A. No, he did not.

"Q. Did he give you free reign [sic] to try the case any way you wanted to try it?

"A. Yes, he did.

"Q. And you knew about the knife, and you knew about the fact that the deceased had a high alcoholic content?

"A. I did."

chosen to proceed upon the theory of self defense, no doubt this appellant would have claimed on motion for new trial that his attorney was derelict in not pursuing the defense of alibi. Appellate courts should not second guess attorneys on matters of trial strategy.

It is my view that appellant had the assistance of a very capable attorney who made the only decision he could have made under the circumstances. If indeed this appellant swore falsely, he must now bear the consequences.

I would affirm this judgment of conviction.

## ON REHEARING

The Assistant Attorney General, representing the state, in brief filed in this court in support of the application for rehearing, charges that this court branded appellant's trial counsel as incompetent in the handling of this case. This is not true. The only time the word "incompetent" appears anywhere in this context is in the state's brief on rehearing.

We stated that the trial counsel made a thorough investigation of this case prior to trial and that he was conscientious and resourceful to the nth degree, but he subordinated his judgment to the whims of his client and, thereby, surrendered control of the case to him. We adhere to that statement.

The testimony of trial counsel on the hearing of the motion for a new trial covers nine pages of the transcript. The dissenting opinion quotes only three questions and answers. In fairness to everyone we think the testimony in its entirety should be set forth with the omission of counsel's name.

"DIRECT EXAMINATION

    *    *    *    *    *    *

"Q. * * * In the course of your preparation for this trial, did you have some conversations with Archie Taylor?

"A. I did. On several occasions.

"Q. Where were these occasions?

"A. Most of the time, in the County Jail.

"Q. Do you recall how many times you talked with him in the County Jail?

"A. No, sir. At least ten times.

"Q. Did you have occasion to go to the scene of this crime, or in the close proximity, and interview any prospective witnesses?

"A. I did.

"Q. Do you recall how many you talked to there?

"A. I talked to Miss Elnora Malone, and I talked to the owner of the cafe on 14th Street, between Third Avenue and Fourth Avenue.

"Q. What prompted you to go to this cafe?

"A. On my first interview with Archie—on my second interview with Archie, he told me that he was in a cafe on 14th Street, between Third and Fourth Avenue, having coffee, talking to two black women that run the place at the time the shooting occurred. That when he finished his coffee he went out the door and saw a crowd of people two blocks away, and he then walked toward the crowd of people, and he was arrested. I went to this cafe. The two black women who were employees there were elderly and didn't seem to understand what I was talking about.

"Q. Did anyone there tell you he was there at the time the shooting occurred?

"A. They said they didn't know anything about Archie. The owner of the cafe said he did not see Archie there.

"Q. Did you make any further investigation, to determine whether or not the defendant had any alcohol in his blood? Did you talk to anybody about that?

"A. I went to the coroner's office—

"THE COURT: You mean, the deceased?

"MR. WAITES: I'm sorry. The deceased.

"A. I went to the coroner's office, to find any information that I could.

"Q. Did you determine that there was some alcohol?

"A. Yes. The lady in the coroner's office showed me the records and gave me some figures about the alcoholic content of the blood and told me she thought this was fairly alcoholic.

"Q. After that occasion, did you go and talk to Archie Taylor again?

"A. Yes. I mentioned the alcoholic content to Archie, and I said that this, along with the knife, which I knew about, we could make out a case of self-defense.

"Q. What was his reply?

"A. He said, 'Maybe we could, but I wasn't there.' And I said, 'Well, I cannot make out a case of self-defense if you weren't there.' And he said, 'Nonetheless, that is what I am going to say. I wasn't there.'

"Q. Did he, in the course of your conversations and the approximate ten times in the County Jail—Did you have some conversations with him here in the courtroom?

"A. I did, on the two days we were in the courtroom. The day we were here for striking a jury, I had a conversation with him at that time. I told him that the State had offered him twenty years on a guilty plea.

"Q. What was his reply to that?

"A. His reply was that he couldn't plead guilty because he did not kill Mason, and that his conscience would be clear, to just go ahead and try him and let him go on to jail.

"Q. Did he, at any time, tell you that he was at the scene and that he saw a knife, from his own personal knowledge there was a knife there, or that Mason was drunk in his opinion?

"A. No, he never told me that. I was the one that found out about the knife, first.

"Q. Did you have any conversation with Archie Taylor about his feet?

"A. Yes. Archie said that he had something wrong with his feet and that he couldn't run. He said that he had been treated at the Vocational Rehabilitation Center, on the Southside, for alcoholism and for his feet. He gave me the name of Mr. George Holmes to contact. I contacted Mr. Holmes. Mr. Holmes said I would have to have a medical release from Archie. I got the release. Archie signed the release, and I got this letter (indicating) from Mr. Holmes.

"Q. Does that say he has some problem with his feet?

"A. It says that the only medical information he has indicates that this man has blurred vision and falling arches.

"Q. Fallen arches. All right. Was his contention at that time—

"THE COURT: Did you say 'falling,' or 'fallen'?

"A. Falling, f-a-l-l-i-n-g (spells).

"Q. Was it his contention at that time that he could not be the person that supposedly killed Mason, because that person was running from the scene and he couldn't have possibly run?

"A. That's right.

"Q. All right. When Archie Taylor took the stand, did you ask him about that fact?

"A. I did.

"Q. Did he say at that time, to the jury, that he couldn't have been the man that was running because he couldn't run?

"A. That's right.

"Q. Substantially the same thing he said today?

"A. That's right.

"Q. And he told you about the bad feet, and you asked him about that on the stand, did you not?

"A. I did.

"Q. Did Archie Taylor, at any other time, volunteer any other people, other than the ones you have mentioned, to be used as witnesses on his behalf?

"A. He gave me several names of people that he did work for, and he said these would testify as to his good character.

"Q. I am talking about, so far as the facts at the scene are concerned.

"A. That's all.

"THE COURT: What about this—you talked about character. Since it is in the record, did you pursue that?

"A. I only contacted one lady, Mrs. Bush, in Vestavia, and she just said that Archie did yard work for her, and that that's all she knew about him.

"Q. These names of people were not names of people in his community?

"A. No. They all lived in Vestavia, or Mountain Brook.

"Q. People he did work for?

"A. Yes. I did not pursue it any further, because I had gone down to the County Jail and got the FBI report on Archie and saw that he had a long list of convictions.

"Q. Did he volunteer to you the fact that he had been arrested in all these various places?

"A. No. My first contact with Archie, I asked him had he been arrested before, and he said, 'No,' that he was a peaceful man. After I obtained the FBI report, I confronted him with it again, and he said, 'Yes,' he had been arrested once in New York for assault and battery.

"Q. That is the only one—

"A. —and he showed me a scar on his arm.

"Q. Is that the only one that he admitted to you that he had been arrested on?

"A. That is the only one. As a matter of fact, he denied being arrested at any other times.

"Q. Did you have some conversations with Archie before the trial in February?

"A. Yes.

"Q. When he was brought down from the jail?

"A. I did.

"Q. Did you again have a talk with him about using the knife and the fact that the victim was drunk as a defense.

"A. Yes, I did.

"Q. What did you say to him and what did he say to you?

"A. I told Archie, 'This is the last chance we have.' The jury was already in the box, and the trial hadn't started yet. I told Archie, 'This is the last chance we have,' that, 'We don't have a case unless I can go for self-defense.' Archie said, 'The only thing I can say is that I wasn't there.' I told Archie, 'Then I will not defend you on self-defense if you were not there.'

"Q. All right. While Archie was seated where he is right now (indicating), and you were sitting here (indicating), and I was sitting here (indicating), where I am now, during the trial, did you have some conversation with him at that time along the same lines you just mentioned?

"A. Yes, again I did, and he said his conscience would not let him testify to the fact that it was self-defense, because he was not there. Archie never mentioned self-defense. I always brought it up.

"Q. Before, or during the trial, did he tell you another story about where he had been?

"A. About two minutes before the trial started, Archie said, 'I believe—' —he changed his story. He said, 'I believe I was in jail at the time this murder was supposed to have been committed.' I asked him did he have any proof he was in jail, and he said, 'Yes,' that he had a little ticket. When they take the personal belongings, they give you a receipt for them. He showed me this ticket. It had a number on it that looked to me like it was a 1, which was August 1st, which was the day this murder was supposed to have been committed. I used it because it was the only thing I had. It turned out later that this 1 was actually a 7.

"Q. He told you that he was in jail, though, did he not?

"A. That's right. He said, 'By the way, I do remember where I was. I was in jail.' This was the first time I had heard it. For the six months leading up to the trial, Archie always maintained that he was in a cafe on 14th Street. Only about two minutes before the trial did he ever mention that he was in jail.

"Q. Now, you have heard him on the stand today—in my words—vehemently denying he was there. In your opinion, is that his attitude during the six months you talked to him and during the course of the trial?

"A. That was his attitude every time I talked to him, that he was not there, that he could not have killed Mason because he was not there.

"Q. In our opinion, if you had questioned him on the stand about Mason having a knife, or being drunk, would he have held to that story that he was just not there?

"A. Yes.

"Q. Now, Archie didn't tell you about this knife being at the scene, did he?

"A. No. I just learned it from reading the grand jury notes, which were in the possession of Rufus Elliott.

"Q. Okay.

"A. He let me read the grand jury notes. Then I asked Archie about it.

"Q. But he did not tell you about it at first, did he?

"A. No.

"Q. And he did not tell you anything about Mason appearing drunk that morning, did he?

"A. No.

"MR. WAITES: That's all.

"CROSS EXAMINATION

"Q. (BY MR. HOWARD) In your investigation of the homicide, was it revealed to you that Archie Taylor was drunk that morning?

"A. About halfway through the trial, I asked one of the officers, the arresting officer, if Archie had been drinking, and he said he thought he had been drinking a little bit. Archie told me before that he had not been drinking that morning.

"Q. Okay. Did Archie tell you anything about his educational background, or anything, during the time you were interviewing him?

"A. No.

"Q. In your opinion, would you classify him as an educated, semi-educated, illiterate, or just how would you classify your client?

"A. Archie was a very articulate person. The only thing I can say, he was awfully confused about events and sequence of events and dates. Other than that, Archie spoke quite well.

"THE COURT: How old is he?

"A. He told me he was 58, but now he says he is 59.

"Q. Did he ever tell you, 'Do not use self-defense in my case'?

"A. No, he did not.

"Q. Did he give you free reign [sic] to try the case any way you wanted to try it?

"A. Yes, he did.

"Q. And you knew about the knife, and you knew about the fact that the deceased had a high alcoholic content?

"A. I did.

"MR. HOWARD: That's all I have.

"MR. WAITES: Nothing further, Your Honor.

"THE COURT: All right, you can go down."

In Williams v. Beto, 354 F.2d 698, 705, 706 (5th Cir. 1965), it was held:

When one seeks the assistance of counsel, he thereby confesses his own inadequacy in the field and stipulates his willingness, like any other client, . . . to be bound by the presumably superior knowledge of the professional man on whose assistance he proposes to depend.

He agrees that this attorney will be in charge of his defense in the legal battle about to begin . . . .

If the indigent client, conferred upon and trusted to the lawyer, knows more about what ought to be done in handling the case, then he needs no counsel and it is folly for him to ask for it.

In Williams v. Beto, supra, the Court said:

"Court appointed counsel is no different to any other lawyer. He is still a lawyer, he is still practicing law, *and he is no less confronted by difficult decisions of tactics and strategy.* He cannot stand still and do nothing. * * * *He must decide as his knowledge, experience, and talents best permit, and then move ahead.* When he does this, that is all any lawyer can do, and the client has no right to complain of the absence of a miracle." Citing cases. (Emphasis supplied).

This is yet another case pointing out that *control of the law suit dwells in the lawyer.*

Opinion extended. Application for rehearing is overruled.

Application overruled.

CATES, P. J., TYSON and DeCARLO, JJ., concur.

ALMON, J., dissents.

ALMON, Judge (dissenting).

I adhere to my view expressed on original deliverance. I think the additional testimony set forth on rehearing confirms the import of the three questions and answers that I set out in my original dissent and the view expressed therein. It is well that the Court has now seen fit to set forth this testimony in its entirety. It would have been better to have done so in the original majority opinion.