[No. B062150. Second Dist., Div. Four. Nov. 8, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS RAY GADSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.*

## Counsel

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Robert F. Katz and S. Allison Hughes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VOGEL (C. S.), J.—**

I

STATEMENT OF THE CASE

Following a jury trial, defendant Thomas Ray Gadson was convicted of first degree burglary, two counts of robbery, forcible oral copulation in concert, forcible sodomy, two counts of forcible rape, and grand theft auto. The jury found true the enhancement allegations that the crimes were committed with use of a firearm. Sentenced to state prison, defendant appeals. His primary contention is that he was denied effective assistance of counsel at trial because his lawyer acquiesced to his request to call him and two other men as defense witnesses even though counsel believed their testimony would be perjurious. His secondary contention is that the trial court erred in finding Randi R., one of the two victims of his crime spree, to be unavailable to testify at trial and therefore allowing the introduction at trial of her testimony from the preliminary hearing. We reject both contentions[1] and affirm.

II

STATEMENT OF FACTS

The evidence presented at trial consisted of the following. Additional facts will be set forth as necessary to our discussion of the legal issues.

*The Prosecution's Case-in-chief*

The crimes occurred during the evening of September 9, 1981. While Stuart and Randi R. were asleep in their home, defendant and James Wingfield broke into the residence. The two men entered the bedroom, turned on the ceiling light, awoke the two, and pointed a gun at them. Pursuant to defendant's instruction, Wingfield tied up the two victims. Defendant and Wingfield then searched the house for valuables. At one point, defendant and Wingfield brought a metal file box into the bedroom and demanded the combination. Stuart R. complied and the box was opened.

---

[1]The second contention is analyzed in the nonpublished portion of our opinion.

Defendant then took Randi R. into another room where he forced her to orally copulate him after which he sodomized and raped her. Wingfield, who had entered the room during these sexual assaults, also raped the victim.

Thereafter, defendant and Wingfield took the victims' car and fled with personal property worth approximately $10,000. Stuart R. untied himself and then freed his wife. The police found defendant's left palm print on the inside kitchen windowsill and his fingerprints on the metal file box he and Wingfield had handed to the victims, demanding its combination.

Several weeks after the crimes, Randi R. selected defendant from a photo-show as "the person who robbed and raped [her]" and, at the 1984 preliminary hearing, identified defendant and Wingfield as the men who had broken into her home. Stuart R. identified defendant and Wingfield at both the 1984 preliminary hearing and the 1991 trial.

*Defense*

Defendant tersely testified that he was "innocent of this case." To support this defense, he called two witnesses, Wingfield and Virgil Byers. Wingfield, who had been tried and convicted the previous year for the subject offenses, admitted having committed the crimes at the R. residence but averred that Byers, not defendant, was his accomplice. Byers, who conceded that he was serving a term of 49 years to life for convictions unrelated to these events, likewise testified that he committed the crimes with Wingfield.

*The People's Rebuttal*

Stuart R. viewed Byers in the courtroom and testified: "I have never seen that man in my life."

## III

### DEFENDANT WAS GIVEN CONSTITUTIONALLY ADEQUATE REPRESENTATION

*Factual Background*

Defendant's claim that his trial attorney's performance was constitutionally inadequate is based on the following events.

Prior to the presentation of the defense case, defendant's attorney told the court that defendant, contrary to counsel's advice, wished to testify and to call Wingfield and Byers as witnesses. Although counsel did not explain

why he felt ethically bound not to call the three men,[2] on this appeal, defendant states that he "takes no issue with the assumption[ ] that the ethical quandary concerned the possibility of perjurious testimony," an assumption we shall accept. Counsel informed the court: "It's my understanding that he [defendant] has a constitutional right to testify and it is my role, not only with himself and these witnesses, to call those people to stand, to ask them their names and ask them what happened and for them to be allowed to engage in a narrative of their interpretation of the event." Defendant responded that he wished to employ this procedure.

To ensure that defendant understood the situation, the court engaged in the following colloquy with him. It told him: "What this means, Mr. Gadson, is with regard to your testimony and with regard to the testimony of the other witnesses, while [your attorney] will be here, he will not be conducting that examination. It will not be a question and answer situation as we see with other witnesses. [¶] Rather, you and these other two witnesses, after they are introduced, will be allowed to testify in a free-flow narrative way, and if you wish to elicit additional information you will have to ask the questions of them." Defendant responded he "would love to do that." The court further advised defendant that the prosecutor would be permitted to impeach him and his witnesses with felony convictions and advised "[t]hat can work to your disadvantage. My guess is there are many good reasons [your lawyer] doesn't want to call you or the other witnesses. My advice to you is to follow his advice. But that's your business. You have a constitutional right. [¶] . . . [¶] . . . [I]n addition to these other things, you have to understand that the testimony from you or from these witnesses will be subject to all of the other rules governing the admissibility of testimony. The DA may make objections, the DA may cause some things to be excluded from testimony and you are going to have to bring that testimony in pursuant to all rules of evidence. Do you understand that?

"The Defendant: Yes, your honor.

"The Court: Another thing you want to think about. To this limited degree, Mr. Thigpen [defense counsel] having chosen not to participate in this examination, you will be to a limited degree acting without a lawyer and acting as your own lawyer to some extent. Is it your desire to do that?

"The Defendant: Yes.

---

[2]Following the completion of the defense case, the court conducted an in camera hearing pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. The transcript of that hearing has been filed with this court under seal. (Cal. Rules of Court, rule 33.5(a).) We have reviewed the transcript and merely note that in the course of the hearing, defense counsel amplified his concerns about calling the three as witnesses.

"The Court: Now another thing you want to think about is the possibility that a jury, having seen this trial conducted in a question and answer situation all the way up to now and then having you and these two other fellows testify in a narrative, they may jump to the conclusion that your own lawyer doesn't believe it. [¶] Do you understand that is a possibility?

"The Defendant: Yes, your honor.

"The Court: I want to tell you I think you are making a mistake. I don't know the details and I don't know what they are going to testify to, but given all the circumstances I think you are making a mistake, and given all the circumstances it my [*sic*] have a real negative affect [*sic*] on what's going on here, and my advice to you is not to do it. I want to give you that for the record. You have the right to testify and you will be given that. I would advise you not to. [¶] Do you still want to do it?

"The Defendant: Yes."

Outside the presence of the jury, the court then permitted defendant's attorney to argue which, if any, felony convictions could be used to impeach the defense witnesses.

Proceedings in front of the jury resumed. Defendant's attorney called Wingfield as his first witness.[3] Defense counsel asked him his name and whether he recalled the events of September 9, 1981. He then instructed Wingfield to "[t]ell us what happened that night." In a narrative fashion, Wingfield described how he and Byers broke into the R. home, confronted and tied up the victims, and searched for valuables. Defendant then asked Wingfield specific questions about the two men's actions, including the sexual assaults upon Randi R. To neutralize the prosecutor's anticipated impeachment, defendant asked Wingfield about the 47-year sentence he had received as a result of his convictions for these crimes, his other felony convictions, his relationship with defendant, and what, if anything, Wingfield would gain from his testimony.

The prosecutor cross-examined Wingfield about various details of the crimes. Wingfield could not explain the presence of defendant's fingerprints in the R. home. On redirect examination, defendant explored the possibility that law enforcement had planted his fingerprints at the scene of the crime.

Following the completion of Wingfield's testimony, the court noted, outside the presence of the jury, that defendant had "handled himself very

---

[3]Wingfield was represented by an attorney who was in court throughout the proceedings.

well, posed what I saw as insightful objections on occasion," and that defense counsel "has also been here throughout and has at the very least been offering a guiding hand to the defendant and certainly has been present . . . ."

When trial resumed, defense counsel called Byers to the stand.[4] The court told the jury: "I presume this testimony will proceed in a manner similar to the testimony of Mr. Wingfield. He will testify largely in a narrative fashion. If there are certain areas Mr. Gadson [defendant] believes need to be covered or expanded upon, Mr. Gadson will be again given the opportunity to ask questions and participate in that manner in the direct examination of this witness." Defense counsel then asked Byers his name and to recount what had happened on September 9, 1981. Defendant then questioned Byers. Byers testified that he and Wingfield had committed the crimes at the R. residence. On cross-examination, Byers gave vague and contradictory answers to questions about the specifics of the crimes and, like Wingfield, was unable to explain the presence of defendant's fingerprints at the crime scene. He conceded he was serving a term of 49 years to life for convictions on unrelated offenses.

Following completion of Byers's testimony, defense counsel called defendant to the stand. After asking him to state his name, counsel asked if he recalled "anything about the night of September 9, 1981?" Defendant responded that he had no recollection whatsoever of that day. The court stated: "Mr. Gadson, I will allow you to testify in a narrative manner if that is your desire. [¶] If you have anything more to say with regard do [sic] this case that is relevant to the charges against you, you may proceed." Defendant answered: "Actually I have nothing to say as far as this case, other than I'm innocent of this case." The prosecutor's brief cross-examination focused primarily upon defendant's prior felony convictions. On redirect examination, defendant merely reiterated his innocence in a conclusory fashion.

Prior to the presentation of closing arguments, the court stated that both defense counsel and defendant would be permitted to present argument. The court and defendant engaged in the following colloquy:

"The Court: All right. Mr. Gadson, back to you, I have indicated yesterday and again today that I am willing to allow you to address the jury if that is what you want to do. Do you still wish to do that?

"The Defendant: Yes.

---

[4]Pursuant to the court's request, separate counsel had spoken to Byers about his proposed testimony and remained present throughout Byers's testimony to answer any questions from him.

"The Court: As I indicated to you yesterday during our discussions, I have some concern because this is a different kind of a proceeding we are having here. Under the circumstances I think it is fairest—I want to deal with the issues we have before us not only the factual issues of this case but the manner in which the defense case has unfolded. I asked you yesterday if you had represented yourself. I believe I know you told me you had, I believe you were granted pro[.] per[.] privileges in this very case, were you not?

"The Defendant: Yes.

"The Court: And for how long did you represent yourself in this case?

"The Defendant: About four months.

"The Court: All right. Had you ever appeared or represented yourself in a case other than that one?

"The Defendant: Yes.

"The Court: More than once?

"The Defendant: Yes.

"The Court: How may times, just for the record?

"The Defendant: Three times.

"The Court: Have you ever taken a case all the way through a full trial and everything?

"The Defendant: No. Preliminary, that would be five.

"The Court: Do you have a recollection of the rights and admonitions that you were warned of at the time you were given pro[.] per[.] status?

"The Defendant: Yes.

"The Court: Okay. I, of course, informed you of those rights yesterday also. The one I am just concerned with is that I think I probably am repeating myself but I want you to know No. 1, it is against my advice that you are doing this. I know you have the right and I will grant you the right, but I advise against it. My theory is that you might say something really harmful to your case because you will be dealing with some complex legal issues and legal problems. Anything you say in your own argument, the jury will

certainly listen to it. If you say something that hurts your case, you know, you could really get yourself in a jam in terms of this case. Do you understand that?

"The Defendant: Yes.

"The Court: And with all those admonitions and warnings, and pitfalls in my mind it is still your desire to address the jury?

"The Defendant: Yes.

"The Court: All right, and there is no objection from you, Mr. Thigpen [defense counsel]?

"Mr. Thigpen: No."

The prosecutor informed the court that in her closing argument she would not attempt to exploit the fact that part of the defense case was being handled by the accused instead of his lawyer.

Defense counsel's closing argument urged that guilt beyond a reasonable doubt had not been established. He focused on what he characterized as equivocations in the victims' identifications of their assailants. Additionally, he attacked the qualifications and veracity of the People's expert witnesses whose testimony linked defendant with the fingerprints found at the crime scene.

Defendant followed with his closing argument. In addition to reiterating many of the points made by his lawyer, he urged that Wingfield and Byers were truthful when they testified that Wingfield's accomplice was Byers, not defendant.

*Discussion*

Defendant now contends that his trial attorney was incompetent because he acceded to defendant's requests to testify and to call Wingfield and Byers as witnesses. Assuming that each of them proffered perjured testimony and recognizing the venerable principle that trial counsel is ethically precluded from presenting perjured testimony (*Nix v. Whiteside* (1986) 475 U.S. 157 [89 L.Ed.2d 123, 106 S.Ct. 988]), defendant urges that trial counsel's decision to permit them to testify resulted in constitutionally deficient representation. Defendant argues that this procedure forced him to represent himself when he had never formally requested to do so and deprived him of the effective assistance of counsel.

Insofar as defendant urges that trial counsel should have refused to let him testify, the assignment of error is utterly without merit. ■ It is well settled that a criminal defendant has an absolute right to testify over the objection of trial counsel. (See, e.g., *People* v. *Frierson* (1985) 39 Cal.3d 803, 813 [218 Cal.Rptr. 73, 705 P.2d 396]; *People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710]; and *People* v. *Harris* (1987) 191 Cal.App.3d 819, 824-825 [236 Cal.Rptr. 680].) ■ It is also equally well settled that a defense counsel's refusal to participate in the presentation of perjurious testimony from the accused does not deny the client effective assistance of counsel. (*Nix* v. *Whiteside, supra,* 475 U.S. at p. 171 [89 L.Ed.2d at p. 137].) ■ However, neither of those precedents nor the California Rules of Professional Conduct[5] state the appropriate course of action if defense counsel believes the client will lie and the client insists on the right to testify.

In *People* v. *Guzman* (1988) 45 Cal.3d 915, 941-946 [248 Cal.Rptr. 467, 755 P.2d 917], our Supreme Court evaluated actions essentially identical to those followed by defense counsel in the case at bar. There, defense counsel informed the court that his client would testify against his advice and that he (counsel) would employ a narrative approach during the direct examination. The basis of defense counsel's concern was his belief that the defendant intended to lie on the stand. The trial court advised the defendant, inter alia, to follow his lawyer's advice; that his testimony would be subject to the prosecutor's objections and, being untrained in the law, he (the defendant) was not equipped to handle the evidentiary objections; that he could be impeached with prior felony convictions; and that defense counsel would be ethically barred from arguing anything in his testimony that counsel believed to be untrue. Notwithstanding these admonitions, the defendant still chose to testify and did so in a narrative manner.

On appeal, the defendant urged that he was denied effective assistance of counsel because he was compelled to testify in a narrative manner. The Supreme Court rejected the claim. It reasoned: "Counsel's conduct in this case closely followed that formerly prescribed by the American Bar Association (ABA) Project on Standards for Criminal Justice, Standards Relating to

---

[5]Defendant concedes that because trial had commenced, his attorney did not have the option of withdrawing from the case. Nonetheless, we note that permitting defense counsel to withdraw does not necessarily resolve the problem. That approach could trigger an endless cycle of defense continuances and motions to withdraw as the accused informs each new attorney of the intent to testify falsely. Or the accused may be less candid with his new attorney by keeping his perjurious intent to himself, thereby facilitating the presentation of false testimony. Lastly, there is the unfortunate possibility that the accused may find an unethical attorney who would knowingly present and argue the false testimony. Thus, defense counsel's withdrawal from the case would not really solve the problem created by the anticipated perjury but, in fact, could create even more problems.

the Defense Function (Approved Draft 1971) standard 7.7. The standard recognizes that, although counsel need not elicit what he thinks will be perjured testimony, an accused has an absolute right to testify over counsel's objection. [Citation.] Nothing in *Whiteside* condemns the free narrative approach as amounting to ineffective assistance of counsel . . . ." (*People v. Guzman, supra*, 45 Cal.3d at pp. 944-945, fn. omitted.)[6] The court noted that even though defense counsel did not include the accused's testimony in closing argument, nothing in counsel's conduct signalled to the jury a disbelief of the accused. (*Id.* at p. 946.) The court therefore concluded that the defendant had not been denied effective assistance of counsel. Given this analysis, we reject defendant's theory, which is unsupported by any pertinent case authority, that counsel should have refused to call him to the stand and that said refusal constituted ineffective assistance. The solution employed properly reconciled the competing interests which intersected in this situation. Defendant was able to testify on his own behalf; trial counsel refrained from actively participating in the presentation of false testimony; defendant was still afforded the assistance of trial counsel; and the integrity of the adversarial system of justice was not compromised.

█ We now turn to defendant's claim that trial counsel's representation was constitutionally deficient because he did not refuse to call Wingfield and

---

[6]In a footnote, the Supreme Court explained the history of former standard 7.7 as follows: "Former standard 7.7, designed to be compatible with the ABA Code of Professional Responsibility, stated: 'Testimony by the defendant. [¶] (a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely. [¶] (b) If, before trial, the defendant insists that he will take the stand to testify falsely, the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary. [¶] (c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, the lawyer may not lend his aid to the perjury. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not receive or rely upon the false testimony in his closing argument.'

"Standard 7.7 was not included in the 1980 second edition of the ABA Standards for Criminal Justice (hereafter ABA Standards). The editorial note to that edition explained, 'the question of what should be done in situations dealt with by the standard has been deferred until the ABA Commission on Evaluation of Professional Standards reports its final recommendations.' In the 1983 Model Rules of Professional Conduct, standard 7.7 was rejected by rule 3.3 (lawyer has duty to disclose falsity of evidence, even if disclosure compromises client confidences). [Citations.]

"California has not adopted any rule patterned on model rule 3.3. As the ABA's Editorial Note to standard 7.7 observes, some courts continue to endorse that standard's recommended procedures. [Citations.]" (*People v. Guzman, supra*, 45 Cal.3d at p. 944, fn. 8.)

Byers as defense witnesses. Although this precise issue has not been squarely addressed by the California courts,[7] we believe that our Supreme Court's opinion in *People* v. *Guzman, supra,* strongly suggests that trial counsel's actions did not result in ineffective assistance of counsel.

Defendant first places great emphasis on the principles that it is counsel's role to decide which defense witnesses will be called to testify (see, e.g., *People* v. *Williams* (1970) 2 Cal.3d 894, 903-906 [88 Cal.Rptr. 208, 471 P.2d 1008]), and that counsel has no duty to call witnesses who will testify untruthfully (see, e.g., *In re Branch* (1969) 70 Cal.2d 200, 210 [74 Cal.Rptr. 238, 449 P.2d 174]). This approach misses the mark. The question is not would it have been proper for defense counsel to refuse to call Wingfield and Byers as witnesses given his belief that their testimony would be perjurious because that is not what trial counsel chose to do. Thus, defendant's reliance upon cases which have upheld such action by trial counsel are inapposite. (See, e.g., *People* v. *Schultheis* (Colo. 1981) 638 P.2d 8, 12-13, and *Sanborn* v. *State* (Fla.Dist.Ct.App. 1985) 474 So.2d 309, 312.) Instead, the real question is whether counsel's refusal to override defendant's wishes and his decision to call the two men to the stand to permit them first to testify in a narrative fashion and then to answer questions posed by defendant resulted in constitutionally deficient representation. We answer that question in the negative.

Trial counsel's actions were the result of an effort to reconcile his obligation as an officer of the court with his duty to vigorously represent his client. To discharge his ethical obligation to the court, defense counsel communicated, albeit in a cryptic manner, his concern about the witnesses' testimony and refrained from referring to the testimony in his closing argument. To discharge his duty to represent defendant, he called as witnesses the two men whose testimony defendant claimed would exonerate him. Through this procedure, the witnesses were able to present their versions of the events to the trier of fact. We believe that counsel's actions were a reasonable attempt to solve a dilemma to which there was no clear solution. Given that this procedure is permissible if the witness is the accused (*People* v. *Guzman, supra,* 45 Cal.3d at pp. 941-946 and authorities and cases cited therein), we find no error in applying it to the potentially perjurious defense witness in this situation. The procedure allows the accused to present what he believes is significant evidence of innocence;

---

[7]A few courts in other jurisdictions have concluded that actions such as those employed by defense counsel in the present case resulted in ineffective assistance of counsel. (See, e.g., *State* v. *Lee* (1984) 142 Ariz. 210 [689 P.2d 153, 157-159], and *State* v. *Robinson* (1976) 290 N.C. 56 [224 S.E.2d 174, 180].) For the reasons to be set forth, we do not agree with that conclusion.

defense counsel is protected from participating in the fraud; and the defendant is still assured of the aid of counsel in all other portions of the trial.

Furthermore, had counsel refused to call Wingfield and Byers, and defendant were thereafter convicted, defendant would have no doubt filed a habeas corpus petition claiming that counsel had been ineffective for failing to present important exculpatory evidence. He would have urged that the testimony of Wingfield and Byers was of such a critical nature that his chances of an acquittal would have been materially increased by its use. The petition would, on its face, have potential merit as defendant could have offered declarations executed under penalty of perjury from the two men; Wingfield would have asserted that Byers, not defendant, was his accomplice, and Byers would have "confessed" that he, not defendant, committed the crimes. While such a collateral attack on any conviction may have ultimately proved unsuccessful after an evidentiary hearing was held in which defense counsel explained his tactical decision not to call the two men, scarce judicial resources would have been consumed in the process. Thus, counsel's actions helped render any such proceeding unnecessary. Moreover, by permitting defendant to call the two men whom defendant asserted would exonerate him, defendant was able to present his defense and was given his "day in court."

Furthermore, defendant's claim that this solution deprived him "of his constitutional right to counsel on matters unrelated to the allegedly perjurious defense" is clearly refuted by the record. In furtherance of his role as advocate for his client, counsel extensively cross-examined the People's witnesses, argued to the court on defendant's behalf about the proper scope of impeachment of Wingfield and Byers, participated in the selection of jury instructions, raised concerns about the verdict forms presented to the jury, presented vigorous closing argument that the People had not discharged their burden of proof, and at the sentencing hearing, presented a fact-specific argument for a lesser sentence. Given all of these factors, we find that trial counsel performed as "a reasonably competent attorney acting as a diligent, conscientious advocate." (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) His decision to refrain from examining Wingfield and Byers and arguing their testimony and to permit defendant to conduct such an examination and participate in closing argument was a reasonable tactic and competent solution to the quandary posed by defendant's demands.

We do not believe that a defendant's right to effective assistance of counsel embraces the right to insist upon presenting witnesses over counsel's advice and then, if that effort fails to convince the trier of fact, to try to

overturn the conviction on the basis that counsel should not have acceded to the request in the first instance. Defendant pursued this course of action against both counsel's wishes and the advice of the court and now must live with the consequences of his request.[8] A contrary conclusion would allow an unscrupulous defendant to cynically manipulate the judicial system.[9] We cannot countenance such a result and we eschew this "Catch 22." In sum, defendant was not deprived of the effective assistance of trial counsel.

■   Defendant's second line of attack on his trial attorney's conduct is to urge that counsel's refusal to examine Wingfield and Byers and his (defendant's) concomitant questioning of the two men forced him to represent himself without a full and explicit waiver of the right to counsel. The argument is not persuasive.

In *People* v. *Guzman, supra*, 45 Cal.3d 915, the defendant raised a very similar claim. He contended that being compelled to testify in the narrative manner because of counsel's refusal to examine him forced him to engage in a limited form of self-representation without a knowing and explicit waiver of the right to counsel. The Supreme Court rejected this assignment of error with the following analysis. "Defendant was 'forced' to represent himself only with respect to his own direct testimony. Counsel was available for and participated in all other stages of the trial. Therefore, it was not necessary that the trial court's warnings about the dangers of self-representation be as complete as would be necessary for a defendant who sought to conduct his entire defense. More important, the court expressly advised defendant of the dangers of the free narrative approach. Defendant understood the dangers and had time to consider them before he insisted on testifying. Because of

---

[8]In view of this analysis, defendant's subsidiary contention that his conviction must be reversed because counsel's actions allowed for the presentation of false evidence and therefore perpetrated a fraud on the court need not detain us. Contrary to defendant's argument, it *does* make a difference that the perjury occurred at his behest. Simply stated, he has no standing to complain as he ignored both the advice of counsel and the admonitions of the learned trial judge and insisted upon presenting the testimony. The responsibility for attempting to perpetrate a fraud upon the court and jury lies squarely with defendant himself. (Compare Pen. Code, § 1473, authorizing a writ of habeas corpus if substantially material false evidence was introduced *against* a person.)

[9]The trial court recognized this aspect of defendant's conduct at the sentencing hearing. It stated, in pertinent part: "The court also notes with regard to this sentencing that during the course of these proceedings the defendant has lied, he has fabricated, he has attempted every devious and unethical maneuver the court can imagine. At one point he came in and clearly feigned illness, mental illness. It was an obvious fabrication on his part, delaying proceedings for some considerable period of time until he chose to cease with that charade. [¶] He brought in his pals from prison, had them lie in an obvious attempt to frustrate justice in this case. Another frankly laughable charade put on by the defendant. [¶] During the entire course of these proceedings he has done everything he could to thwart the ends of justice, and this is the time at sentencing when the court will acknowledge such things."

the limited nature of his self-representation and the ample warnings given, it was unnecessary for the court to have warned him further that the jury might infer he was lying." (*Id.* at p. 946.)

Applying this reasoning to the present case, we find no error. To the extent that defendant represented himself in examining Wingfield and Byers and presenting closing argument to the jury, this constituted a limited portion of the trial. As previously noted, his attorney vigorously represented him in all other portions of the trial. Moreover, the reason for the self-representation was defendant's decision to override counsel's advice not to present this evidence. But before this happened, the trial court informed defendant that counsel would not be able to participate in this one phase of the proceeding so that defendant would be "acting as [his] own lawyer to some extent"; warned him that in doing so, he would be held to the standards of a lawyer; cautioned him that the jury may draw an adverse inference from this procedure; and advised him several times not to follow this course of action. Throughout these discussions, defendant never wavered from his desires but instead reiterated his wish to call and examine Wingfield and Byers. Furthermore, the court repeated these admonitions before defendant presented closing argument. Given the limited nature of defendant's self-representation and the detailed warnings given by the trial court, we do not find any constitutional error in the proceeding.

In sum, defendant created a situation which no one solution could completely resolve. Given the competing interests involved, any solution would necessarily contain the seeds of additional problems. "The decision as to the proper course of conduct in these situations must often be made—as it was here—in the midst of trial, with little time to consult law reviews in order to obtain scholarly views on an issue on which there is essentially no case law." (*State* v. *Lee*, *supra*, 689 P.2d at p. 165 (conc. and dis. opn. of Feldman, J.).) Defendant's trial counsel and the trial court did an admirable job in responding to defendant's demands.

IV

THE TRIAL COURT DID NOT ERR IN FINDING RANDI R. TO BE UNAVAILABLE BECAUSE OF ILLNESS*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1700.

## V

### DISPOSITION

The judgment is affirmed.

Woods (A. M.), P. J., and Conway, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied January 26, 1994.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.