[No. D050721. Fourth Dist., Div. One. Aug. 27, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
EXODUS BOLTON, Defendant and Appellant.

COUNSEL

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Angela M. Borzachillo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

I.

INTRODUCTION

Defendant Exodus Bolton appeals from his conviction and sentence after a jury trial. The charges against Bolton arose out of two separate incidents during which Bolton became involved in physical altercations with passengers on San Diego trolleys. Bolton was convicted of one count of assault with a deadly weapon, one count of mayhem, two counts of battery, and one count of resisting an officer.

On appeal, Bolton contends that the trial court erred in permitting him to represent himself at trial because, he asserts, he did not make a voluntary, knowing and intelligent waiver of his right to counsel. According to Bolton, because he was "forced to choose between his right to a speedy trial and his right to be represented by competent counsel," his decision to represent himself was not voluntary, knowing and intelligent. Bolton also contends that the trial court abused its discretion when it declined to strike one or more of his three prior prison conviction enhancements.

We conclude that the trial court erred in relieving Bolton's attorney just a few days prior to trial, based on the attorney's assertion that a conflict of interest existed. As a result of the trial court's error in relieving Bolton's counsel, Bolton was forced to choose between his right to a speedy trial and his right to the assistance of counsel. Because we are not convinced beyond a reasonable doubt that the outcome would not have been different if Bolton

had had the assistance of counsel at trial, we reverse the judgment of the trial court and remand the case for a new trial.[1]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *The prosecution's case*

On October 14, 2006, 18-year-old Christian Munoz and his friend, April De La Torre, boarded a trolley in San Diego. De La Torre encouraged Munoz to sit across from her in an empty seat that was next to a woman. Munoz sat down next to the woman. Bolton approached Munoz and pushed Munoz off of the seat, yelling, "Don't be sitting next to my fucking wife." Bolton came within inches of Munoz's face and made statements regarding how he "deals with business" and to the effect that he "takes lives and souls." Munoz was frightened and thought Bolton was going to kill him.

Bolton displayed a knife and handed it to the woman he had identified as his wife, Candice Foxworthy.[2] Bolton told Foxworthy to "handle" De La Torre. Foxworthy then approached Munoz and De La Torre and began asking them if they had a problem. They responded that they did not have a problem. Bolton then told De La Torre that he was going to kill her, and slapped Munoz three times in the face. Munoz and De La Torre got off the trolley at the next stop, and reported the incident to police. Munoz and De La Torre were shown a photographic lineup a few days later. Both identified Bolton as the person who had hit Munoz.

On October 17, 2006, just a few days after the first incident, Reyedward Harris boarded the trolley after school and saw Bolton arguing with another man. Bolton was yelling at the other man, calling him a "fag" and a "bitch," and making a comment to the effect that "Fags hit women." The other man eventually got off the trolley and seemed to challenge Bolton to get off the trolley and fight, but Bolton remained on the trolley.

Bolton's remarks offended Harris because Harris is homosexual. Harris said to Bolton, "Well, fags don't hit women; assholes do." Bolton told

---

[1] Because we are reversing the judgment of the trial court and remanding for a new trial, we need not address Bolton's second contention regarding his sentence.

[2] Although during the incident Bolton claimed that Foxworthy was his wife, defense counsel indicated that Foxworthy was Bolton's girlfriend.

Harris to mind his own business. Bolton then spat on Harris and punched him as many as six times. Harris was cornered and could not escape, so he huddled on the stairs of the trolley and tried to block the blows.

Victor Mendoza witnessed the entire incident, including Bolton's interaction with the man who had gotten off the trolley. Mendoza jumped up and went to Harris's aid, pushing Bolton into a seat until Bolton fell down. Mendoza then punched Bolton once or twice, and the two began fighting. Bolton pulled out a knife and stabbed Mendoza in the chest. Mendoza began kicking Bolton in an attempt to avoid being stabbed again. Mendoza realized that he was bleeding profusely.

At the next stop, Bolton and Foxworthy got off the trolley and ran. Harris went to help Mendoza.

Police detained Bolton and Foxworthy a few blocks away from the trolley stop. Witnesses who had been on the trolley, including Harris, identified them as having been involved in the incident. Bolton had blood on his hands, jeans and face. Police recovered a knife from Bolton's pocket.

Bolton was combative with police as they were conducting curbside identifications, and refused to comply with their orders. One officer's finger was cut as the officer struggled with Bolton. Bolton had to be restrained. Even after he was restrained, Bolton spat in an officer's face and kicked a patrol car door.

Mendoza did not realize how badly he was injured until after the police and an ambulance arrived. He sustained a stab wound to his chest and two stab wounds to his arm, one of which severed a nerve.

A number of witnesses who had been on the trolley testified that they saw Bolton spit on Harris and hit him. They also saw Mendoza come to Harris's aid and push Bolton. The witnesses watched Bolton pull out a knife and stab Mendoza. During the incident, the witnesses heard Bolton make a number of threatening statements, including, "I'm going to kill him," and "I'm from Kansas City, Missouri. I'm a cold-blooded killer. That's how we do it out there."

### 2. *The defense*

Bolton testified on his own behalf. Bolton said that he and his fiancée had come to San Diego from Kansas City so that he could introduce her to his mother and they could get married. Bolton was protective of Foxworthy because she was pregnant. Bolton became angry when Munoz sat next to

Foxworthy, and he told Munoz to move. Bolton claimed that Munoz and De La Torre were acting disrespectfully toward him, and that he gave his knife to Foxworthy so that people would know that he did not intend to use the knife himself.

With regard to the second incident, Bolton claimed that a man had shoved Foxworthy, and Bolton and the man then argued. Harris approached Bolton and told Bolton that he did not like what Bolton had been saying to the other man. According to Bolton, Harris pushed Bolton, so Bolton "popped him on the top of his head." Mendoza then jumped up and pushed Bolton down onto Foxworthy, which, according to Bolton, is when Bolton "probably lost it." Bolton claimed that Mendoza pulled out a knife and cut Bolton's hand. Bolton said that he then pulled out his own knife, in self-defense, and told Mendoza to back up.[3]

## B. *Procedural background*

Bolton was charged by information with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) (count 1)); mayhem (Pen. Code, § 203 (count 2)); making a criminal threat (Pen. Code, § 422 (count 3)); two counts of battery (Pen. Code, § 242 (counts 4 & 6)); and resisting an officer (Pen. Code, § 148, subd. (a)(1) (count 5)). With regard to count 1, the information also alleged that Bolton personally used a deadly weapon (Pen. Code, § 1192.7, subd. (c)) and personally inflicted great bodily injury (Pen. Code, §§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). With regard to count 2, the information alleged that Bolton personally used a deadly weapon (Pen. Code, § 12022, subd. (b)(1)). The information further alleged that Bolton had served three prison sentences within the meaning of Penal Code sections 667.5, subdivision (b) and 668.

On October 30, 2006, the public defender's office declared a conflict with Bolton and withdrew from representing him. The court appointed a private attorney to represent Bolton. This attorney withdrew from representing Bolton on November 15, 2006, after declaring a conflict. The court then appointed Attorney Stephen Cline to represent Bolton. On January 26, 2007, Cline also withdrew after declaring a conflict. Bolton requested that he be permitted to represent himself rather than be forced to waive his speedy trial right again.[4] After Bolton signed a waiver form indicating his decision to forego the assistance of counsel, the trial court agreed to allow Bolton to represent himself at trial.

---

[3] Mendoza testified that although he had a pocketknife with him that day, he did not display it. No witnesses testified to seeing Mendoza with a knife.

[4] According to statements Bolton made to the trial court during this proceeding, he had previously waived his speedy trial right twice in this case in order to allow newly appointed attorneys time to prepare.

A jury trial commenced on January 29, 2007. The jury found Bolton guilty on counts 1, 2, 4, 5, and 6. The jury found true the allegations that Bolton personally used a deadly weapon and that he personally inflicted great bodily injury, with respect to count 1. As to count 2, the jury found true the allegation that Bolton personally used a deadly and dangerous weapon. The jury could not reach a verdict on count 3, and the court subsequently dismissed that charge.

In a bifurcated proceeding, the trial court found that Bolton had served three prior prison terms within the meaning of Penal Code sections 667.5, subd. (b), and 668.

On April 16, 2007, the trial court denied Bolton's motion for a new trial and declined to strike the prison prior enhancements. The court sentenced Bolton to nine years in state prison. Bolton filed a timely notice of appeal.

After the parties filed their appellate briefs, this court requested supplemental briefing, asking the parties to address the following questions:

"1. Did the trial court err in relieving defense counsel four days before the trial date? In addressing this question, please discuss (a) whether defense counsel presented sufficient evidence of the existence of a conflict at the ex parte hearing, and (b) whether, in revealing attorney-client communications and other matters to the trial court, defendant's counsel may have created a situation in which the trial court would have had to relieve counsel whether or not a conflict was otherwise established?

"2. Assuming that the court did err in relieving Attorney Cline, how should this court assess the potential prejudice to the defendant?"

Both parties submitted timely supplemental letter briefs addressing these questions.

### III.

### DISCUSSION

Bolton contends that his waiver of his right to counsel was not voluntary, knowing and intelligent because he was forced to choose between his right to a speedy trial and his right to be represented by competent counsel. In supplemental briefing, Bolton further argues that the trial court erred in relieving his third appointed attorney just four days before the last possible day for trial because, according to Bolton, the attorney failed to establish a sufficient conflict that would warrant relieving counsel. We agree. Neither

Bolton's attorney nor the trial court properly handled the attorney's asserted conflict of interest. As a result of the errors, Bolton was forced to choose between two constitutional rights, through no fault of his own. The error requires reversal.

## A. *Additional background*

On Friday, January 26, 2007, Bolton's third appointed defense attorney, Stephen Cline, advised the trial court that he had a conflict of interest in continuing to represent Bolton.[5] During an in camera proceeding, Cline informed the court that an individual named Dr. Mitchell had evaluated Bolton and had concluded that Bolton has "some form of personality disorder" involving "predatory violent behavior."

Cline described events that had occurred the prior week when Cline and Bolton were in court. Cline had been asking the court to put the matter over so that he could get the County of San Diego to pay for Bolton's girlfriend, who was in Kansas City, to come to San Diego to testify at Bolton's trial. Cline stated, "Mr. Bolton had a blowup essentially and ended up with a number of deputies in the courtroom with him. Shortly thereafter, he began calling my office, got very vulgar, very threatening. [He] [w]as threatening my staff."

Cline said that Bolton had informed Cline that he wanted to represent himself, but then changed his mind a day or two later. Bolton told Cline that he wanted Cline to call him to the stand to testify that one of the victims had a razor, even though Bolton had never mentioned this before, and none of the witnesses could corroborate this story. Cline was concerned that Bolton was going to perjure himself, and came to believe that Bolton was intentionally making it difficult for Cline to locate Bolton's girlfriend so that she would not be available to provide contradictory testimony.

After Cline explained his concerns, the trial court said, "I understand Mr. Cline. [¶] Let me ask you this. Were we to convene in open court and I were to make a record that there was a chambers conference with you after which I determined a conflict had arisen, was going to relieve you as attorney and appoint somebody else, is that going to cause this guy to go off?"

Cline responded that Bolton had "been upset every time he's ever come to court," but that he had not done anything violent. The trial court then commented, "We can handle anything. I'm just trying to talk this through as

---

[5] It is not apparent from the record what formed the basis of the conflicts between Bolton and his prior attorneys.

to how it should play out. [¶] It sounds like—that you and he have reached an impasse as to how to properly defend this case." Cline stated, "I would have to agree with the Court."

The trial court then held further proceedings in open court. The court stated, "The information that Mr. Cline discussed with me results in this Court granting Mr. Cline's motion to be relieved because of a conflict." Addressing Bolton, the court continued, "What this means essentially is this is the date for the trial. Since Mr. Cline cannot go forward as your lawyer, I will be appointing another lawyer to represent you." Bolton immediately responded: "I'd rather go pro per. Because this happened when I—I—I—this is a repeated behavior right here. This is a repeated pattern. I've been locked up for three and a half months, and I waived time for them all through the preliminary hearing process and took 45 days for me to get to prelim. I waived the time from November 2nd for the other lawyer Bukowski to November 15th. [¶] She give my case to Mr. Cline November 15th. He asked me can I waive it two more weeks for him. I waived it. Because this is—I mean, I guess the district attorney doesn't have himself together. He's still fighting for time basically because I asked for a speedy trial."

The following colloquy then occurred:

"The Court: He—

"The Defendant: I'll go pro per. Give me three days. Give me three days. I want my speedy trial. I don't want to give up my rights to my speedy trial. All I need is three days.

"The Court: I'm going to have you fill out a little form if your request is to represent yourself.

"The Defendant: Right. Because each lawyer—

"The Court: Wait a minute. [¶] And I will consider your request after you fill out your form."

"The Defendant: Yes, sir.

"The Court: What we'll do is give you—Is there a jury room available? [¶] · · · [¶]

"The Defendant: I don't really want to give up my rights.

"The Court: I hear you.

"The Defendant: Malarkey.

"The Court: Mr. Garcia, what is the time frame within which this case must be tried?

"Mr. Garcia: Today is the fourth day, your Honor. We have—Tuesday will be zero day. [¶] . . . [¶]

"The Court: So you know what you're doing, sir, today's Friday.

"The Defendant: Uh-huh.

"The Court: Assuming that I give you the right to represent yourself and you want to go to trial without waiving time—

"The Defendant: Exactly.

"The Court:—we'll start—we will find a trial department for you to start Monday or Tuesday. [¶] You are going to be ready by then?

"The Defendant: Yes."

The trial court had Bolton go into an empty jury room to fill out a waiver form. When Bolton finished filling out the form, he returned to the court-room, and the trial court reviewed the form. The following colloquy occurred:

"The Court: . . . [¶] Mr. Bolton, you had an opportunity to fill out the form I provided to you.

"The Defendant: Yes, sir.

"The Court: You initialed a number of boxes and signed your name to the line that says defendant's signature. [¶] Did you read the form before you initialed and signed it?

"The Defendant: Yes, sir.

"The Court: Do you understand the contents of the form?

"The Defendant: Yes, sir.

"The Court: Do you have any questions for me about the form?

"The Defendant: No, sir.

"The Court: Have you ever proceeded in pro per in a trial where you've been charged with a crime before this one?

"The Defendant: No, sir.

"The Court: Are you under any type of doctor's care or prescribed medications at this time?

"The Defendant: Totally clearheaded.

"The Court: Let me make certain that I'm convinced you understand what you're about to do. . . ."

The trial court went on to explain to Bolton the punishment he could face if convicted. After explaining the potential punishment, the court again inquired of Bolton about his decision to represent himself:

"The Court: You know, I think it's a lousy idea for you to proceed on your own without a lawyer.

"The Defendant: Well, my lawyers keep throwing me off their case at the last minute as if they're not really trying to fight for me or work with me. Bukowski threw him—it's a repeated—it's a repeated act here. I can't see nothing but destruction in it for me depending on mankind."

Bolton proceeded to tell the court that he wanted to represent himself, and that he did not want to waive his speedy trial right. The court informed Bolton of the hazards of self-representation. Bolton indicated that he understood the potential pitfalls, and that he still wanted to proceed without counsel. The trial court granted Bolton's request at the conclusion of the hearing, and set the matter for trial the following Monday morning.

On January 29, 2007, Bolton's case was called for trial before a different judge. Bolton appeared without counsel. The following colloquy occurred:

"The Court: Yeah. Now, you executed this form that deals with wanting to represent yourself. And that's what you want to do; is that right?

"The Defendant: I had no choice.

"The Court: Well, no.

"The Defendant: For the simple fact that he—it would have—

"The Court: All right. Let's go back. You've been in custody for how long?

"The Defendant: Three-and-a-half months. And prior to my prelim I waived—well, it [*sic*] ended waiving up to a month-and-a-half. So I finally go to prelim December 1st, and he says that he'll be ready for a speedy trial. He says we can't do nothing until we get [to] late January, close to early February. So he was supposed to be ready. But now he threw me off by [*sic*] this past Friday saying conflict—conflict of interest.

"The Court: That was Steve Cline?

"The Defendant: Yeah. He said conflict of interest right here at trial time, so that was—I looked it up. That's called abandonment of client when an attorney do that. <u>Borr</u> versus <u>State Bar</u> in 1991. That's automatic ground for appeal if I do lose.

"The Court: Uh-huh.

"The Defendant: Because he abandoned his client right here at the last minute. I have everything right here."

After hearing the prosecutor's version of what had occurred the previous Friday, the trial court again gave Bolton the opportunity to waive his speedy trial right and have counsel appointed to represent him. Bolton declined, stating, "I'm ready to know what the outcome is going to be, because it's been three-and-a-half months, and my lawyers have really been doing me wrong. They've been abandoning me left and right. . . ."

The trial proceeded, with Bolton representing himself. The jury found Bolton guilty on all counts, except count 3, on which the jurors were split, seven to five.

B. *Analysis*

1. *Bolton has not forfeited his right to raise this issue on appeal*

As an initial matter, the People contend that Bolton forfeited his right "to challenge the trial court's decision to permit defense counsel to withdraw, as he failed to object in the court below." Although Bolton may not have formally objected to the trial court's decision, he clearly indicated his displeasure regarding his loss of yet another attorney, as we discuss further in part III.B.2., *post.* Additionally, since the trial court already had determined, outside of Bolton's presence and without hearing argument from Bolton, that

a conflict existed and that the court was going to relieve Bolton's attorney, any formal objection Bolton might have raised would have been futile.

2. *The trial court erred in relieving Bolton's counsel only a few days before the last possible trial date, thereby forcing Bolton to choose between two significant rights*

■ "Decisions of this court and the Courts of Appeal have expressly recognized the tension between two rights guaranteed to every criminal defendant, the right to a speedy trial conferred by both the federal and state Constitutions and implemented through the time requirements in statutory provisions such as sections 686, 1381, and 1382, on the one hand, and the right to the effective assistance of counsel guaranteed by the Sixth Amendment, on the other hand. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 938–939 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).)

The tension between a defendant's right to a speedy trial and the right to the effective assistance of counsel frequently arises when a defendant's desire to invoke his right to speedy trial conflicts with his attorney's request for a continuance. (*Frye, supra,* 18 Cal.4th at p. 939.) Courts that have dealt with this conflict have reached different results, depending on the circumstances of the particular case. (*Ibid.*) "Implicit in these decisions . . . is the notion that the inherent tension between the right to a speedy trial and the right to competent, adequately prepared counsel is not, in itself, an impermissible infringement on the rights of the accused, including the right to a fair trial." (*Ibid.*)

In this case, the tension between Bolton's right to a speedy trial and his right to competent, adequately prepared counsel arose only because the trial court relieved Bolton's counsel just four days before the last day on which the trial had to commence under the speedy trial statutes. Given the timing of defense counsel's request to be relieved, together with the lack of evidence establishing the existence of an actual conflict of interest, the trial court should not have relieved Bolton's counsel.

■ " ' "Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person *or by his own interests.*' " ' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 673 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*).) Attorney Cline asked to be relieved from representing Bolton on the basis of an alleged conflict of interest arising from Cline's belief that Bolton intended to testify that a victim had a razor blade, which Cline believed to be untrue. Cline told the court, "And I'm now led to believe in my efforts to track down the

girlfriend that he's hiding her from me because he doesn't want her to come out here because he's essentially going to offer this defense that I know to be false at this point. [¶] I think as a result of that, I'm kind of in a—locked up here."

Despite Cline's assertions, it was not at all clear that Bolton was in fact going to perjure himself. While Cline may have doubted Bolton's claim that one of the victims had a razor blade, Cline did not *know* that this was false. In addition, Cline had only a hunch that Bolton was "hiding" his girlfriend from Cline. Further, Bolton was not given an opportunity to respond to Cline's claims before the court determined that a conflict existed and agreed to relieve Cline.

■ Further, even if Cline suspected that Bolton might testify falsely, requesting to be relieved as Bolton's counsel under these circumstances was not the appropriate method of dealing with the ethical concerns Cline may have had. "Although attorneys may not present evidence they know to be false or assist in perpetrating known frauds on the court, they may ethically present evidence that they suspect, but do not personally know, is false. Criminal defense attorneys sometimes have to present evidence that is incredible and that, not being naive, they might personally disbelieve. Presenting incredible evidence may raise difficult tactical decisions—if counsel finds evidence incredible, the fact finder may also—but, as long as counsel has no specific undisclosed factual knowledge of its falsity, it does not raise an ethical problem." (*People v. Riel* (2000) 22 Cal.4th 1153, 1217 [96 Cal.Rptr.2d 1, 998 P.2d 969] (*Riel*).) Defense counsel's obligation is "to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation." (ABA Stds. for Crim. Justice: Prosecution Function and Defense Function (3d ed. 1993) std. 4-1.2, p. 120.) Thus, it has been held that " '[t]he duty of a lawyer both to his client and to the legal system, is to represent his client zealously within the bounds of the law.' " (*People v. McKenzie* (1983) 34 Cal.3d 616, 631 [194 Cal.Rptr. 462, 668 P.2d 769], italics omitted, disapproved on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [121 Cal.Rptr.2d 580, 48 P.3d 1136].) "Once an attorney has been assigned to represent a client, he is bound to do so to the best of his abilities under the circumstances despite the not uncommon difficulty of that task, particularly in the context of criminal trials. [Citation.]" (*McKenzie,* at p. 631.)

■ In *People v. Johnson* (1998) 62 Cal.App.4th 608 [72 Cal.Rptr.2d 805] (*Johnson*), this court considered the options available to a criminal defense attorney when the defendant asserts his or her right to testify, and the attorney knows or suspects that the defendant intends to give perjured testimony. (*Id.* at

pp. 618–619.) After reviewing various options, including withdrawing from representation, the *Johnson* court concluded that calling the defendant to the witness stand and permitting the defendant to "testify in a free narrative manner" is the solution that "best accommodates the competing interests of the defendant's constitutional right to testify and the attorney's ethical obligations." (*Id.* at pp. 624, 630.)

We reaffirm the conclusion of the *Johnson* court that where an attorney knows or suspects that his client intends to give false testimony, the "narrative approach" best accommodates the interests of both the defendant and the attorney, who is obligated "not to participate in the presentation of perjured testimony." (*Johnson, supra,* 62 Cal.App.4th at p. 629.) As the *Johnson* court recognized, although the "withdrawal approach" may "protect[] the attorney's interest in not presenting perjured testimony, [it] does not solve the problem" (*id.* at p. 622) of "what an attorney should do when faced with a client who intends to commit perjury" (*id.* at p. 620). Further, if the court grants the attorney's motion to withdraw, this can lead to " 'an endless cycle of defense continuances and motions to withdraw as the accused informs each new attorney of the intent to testify falsely. Or the accused may be less candid with his new attorney by keeping his perjurious intent to himself, thereby facilitating the presentation of false testimony. [Finally], there is the unfortunate possibility that the accused may find an unethical attorney who would knowingly present and argue the false testimony.' " (*Id.* at p. 623, quoting *People v. Gadson* (1993) 19 Cal.App.4th 1700, 1710, fn. 5 [24 Cal.Rptr.2d 219].) Thus, as the *Johnson* court observed, " 'defense counsel's withdrawal from the case would not really solve the problem created by the anticipated perjury but, in fact, could create even more problems.' " (*Johnson, supra,* 62 Cal.App.4th at p. 623, quoting *People v. Gadson, supra,* 19 Cal.App.4th at p. 1710, fn. 5.)

Attorney Cline should have utilized the narrative approach if he was concerned about the veracity of Bolton's testimony. Instead, he placed his client in the predicament of having to choose whether to continue to assert his speedy trial rights, which meant that Bolton would have to represent himself at trial, or waive his speedy trial rights against his will, in order to have the assistance of counsel at trial. The trial court permitted Cline to withdraw, despite the fact that his withdrawal was "not necessary under the circumstances," and unfairly placed defendant in the position of having to choose between his right to the assistance of counsel and his right to a speedy trial.

The People suggest that Cline asked to be relieved because of threats Bolton made to Cline and his staff. However, Cline did not specifically state that he believed a conflict existed because he was afraid of Bolton, and the

court indicated that it was relieving Cline *not* because of any threats by Bolton, but because Cline and Bolton "had reached an impasse as to how to properly defend the case."

█ Even if the threats formed part of the basis of the trial court's declaring a conflict, Bolton's alleged threats—which were directed not at Cline, as the People state, but at his employees—would not provide sufficient justification for declaring a conflict of interest and relieving counsel. Although Cline may have implied in his comments to the court that he was afraid of Bolton when he informed the court about Bolton's alleged threats, Cline's only reference to any threat was his statement that Bolton had been "very vulgar, very threatening" to Cline's staff. Further, even if Bolton had threatened Cline directly, under *Roldan, supra,* 35 Cal.4th at page 676, a defendant's threats against his counsel's life do not give rise to a conflict of interest. Here, there is nothing that came close to a threat on defense counsel's life. Rather, there is only the vague allegation that Bolton made threatening phone calls to Cline's staff. Considering the timing of counsel's request to be relieved—i.e., that the request was made only four days before trial had to commence without an additional speedy trial waiver from Bolton—the trial court should not have relieved Cline based on this minimal showing.

█ Importantly, contrary to the People's assertions that Bolton "caused the conflict that required his defense counsel to withdraw . . . necessitating appointment of new counsel and the concomitant delay in the trial," this case does not present a situation in which the tension between the speedy trial right and the right to the assistance of counsel arose as a result of defendant's own conduct. Rather, it arose as the result of actions on the part of defense counsel and the court. There is nothing in the record to suggest that Bolton purposely created a conflict with his attorney or refused to assist his attorney in preparing a defense. While it is true that a criminal defendant " 'may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice' " (*People v. Johnson* (1980) 26 Cal.3d 557, 570, fn. 13 [162 Cal.Rptr. 431, 606 P.2d 738]), it is clear that Bolton did not create the circumstances that caused him to have to choose between his right to a speedy trial and his right to the assistance of counsel.

The record establishes that it was only because of the court's error in relieving Bolton's attorney just four days before trial had to begin that Bolton ultimately waived his right to counsel. This fact distinguishes Bolton's situation from the situation in *Frye, supra,* 18 Cal.4th 894, on which the People rely.

In *Frye*, the Supreme Court considered the defendant's argument that he had waived his rights to a speedy trial "solely in order to obtain the effective assistance of counsel which he had been denied due to the trial court's appointment" of an attorney who ultimately sought to withdraw because of his lack of experience in capital cases. (*Frye, supra*, 18 Cal.4th at p. 938.) Shortly after the defendant in *Frye* was arrested and extradited to California, the court appointed the attorney in question. (*Frye, supra*, 18 Cal.4th at p. 937.) The defendant waived his right to a "speedy preliminary hearing" until his counsel's first appearance. After the preliminary hearing, the attorney moved to withdraw. (*Ibid.*) The trial court then appointed new counsel for the defendant and, over the course of the next four months, the defendant "repeatedly waived his right to a speedy trial." (*Id.* at p. 938.) The defendant raised the issue of a violation of his right to a speedy trial for the first time in his appeal.

The *Frye* court acknowledged the existence of tension between the right to a speedy trial and the right to the effective assistance of counsel, but concluded that there had been no conflict between the defendant's right to speedy trial and his right to counsel in that case because "the record [was] devoid of evidence that defendant affirmatively objected to the delay in his proceedings. In fact, it show[ed] the opposite, that he expressly consented to every continuance." (*Frye, supra*, 18 Cal.4th at p. 939.) The court explained: "[T]he trial court . . . had no need to accommodate defendant's speedy trial right with his desire to be represented by competent, adequately prepared counsel. Having obtained defendant's waiver of the time requirements of sections 686 and 1381 in order to secure counsel and to prepare for trial, the trial court was under no obligation to further consider the theoretical tension between these two rights." (*Frye, supra*, 18 Cal.4th at p. 940.)

Unlike the defendant in *Frye*, when Bolton was informed that the court had relieved his counsel as a result of an alleged conflict, Bolton immediately indicated his objection to having to choose between a delay in the proceedings and being represented by counsel, stating, "I don't want to give up my rights." He also indicated frustration at having to go through the process of being assigned an attorney for a fourth time, and having to waive his speedy trial rights yet again, after already having done so several times in order to allow his previously assigned attorneys time to prepare. On the morning of trial, when asked to confirm his decision to represent himself, Bolton stated, "I had no choice." Thus, although Bolton did ultimately choose to give up his right to the assistance of counsel rather than his right to a speedy trial, Bolton clearly did not do so willingly. Unlike in *Frye*, where there was no evidence that the "defendant affirmatively objected to the delay in his proceedings," the record in this case demonstrates that Bolton did, in fact, object to having to waive his right to the assistance of counsel if he also wanted to insist on his right to a speedy trial.

The trial court relieved Bolton's counsel only four days before the final date for trial, without sufficient cause for doing so, and without providing Bolton an opportunity to be heard regarding the alleged conflict. Because of the trial court's error, Bolton was forced to choose between his right to a speedy trial and his right to counsel. Under these circumstances, we cannot conclude that Bolton's waiver of his right to the assistance of counsel was voluntary.

### 3. *Bolton was prejudiced by the court's error*

Bolton claims that he was erroneously deprived of his right to counsel, and that the error is structural and requires automatic reversal. It is not clear, however, that the per se reversal standard is appropriate in this case. Bolton was not *wholly* denied the opportunity to be represented by counsel, in that he could have chosen to have new counsel appointed instead of insisting on his right to a speedy trial. If he had chosen to have new counsel appointed and to once again waive his right to a speedy trial, rather than his right to counsel, he would have to demonstrate prejudice on appeal arising from speedy trial right claims under state statutes, the state Constitution, or the federal Constitution. (See *People v. Martinez* (2000) 22 Cal.4th 750, 769 [94 Cal.Rptr.2d 381, 996 P.2d 32] [speedy trial claims based on statute raised after judgment require demonstration of prejudice, as do speedy trial claims under the state Constitution]; see also *People v. Anderson* (2001) 25 Cal.4th 543, 603 [106 Cal.Rptr.2d 575, 22 P.3d 347] [in determining whether federal speedy trial right has been violated, court must invoke balancing test that includes weighing the prejudice to the defendant].)

The alternative to the per se reversal standard in this case is the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*), since the error affected Bolton's constitutional rights. Under that standard, reversal is required unless the People establish that the court's error was "harmless beyond a reasonable doubt." (*Ibid.*) Whether we apply the per se reversal standard or the *Chapman* standard of prejudice in this case, we would reach the same result, because we are not convinced beyond a reasonable doubt that the outcome would have been the same if the trial court had not relieved Bolton's counsel.

It is clear that Bolton would have continued to assert his right to the assistance of counsel if he had not been forced to make a choice between that right and his right to a speedy trial. It is possible that the outcome of this case would have been different if Bolton had been represented by counsel at trial. The jury did not accept the prosecution's case in its entirety. The jury could not reach a unanimous verdict on count 3, the criminal threat count, demonstrating that the jury did not believe all of the testimony of the

prosecution's witnesses. Under these circumstances, we cannot conclude, beyond a reasonable doubt, that the assistance of counsel in cross-examining witnesses and challenging the admission of evidence would not have affected the verdicts.

## IV.

## DISPOSITION

The judgment of the trial court is reversed and the matter is remanded for a new trial.

McConnell, P. J., and McIntyre, J., concurred.